MOORE, Judge.
 

 R.T.B., the mother, appeals from the judgments of the Calhoun Juvenile Court finding four of her five children, O.D.P., Jr. (“O.D.P.”), born February 29, 1996; T.J.T., born March 7, 1999; T.M.T., born March 23, 2002; and M.L.B., Jr. (“M.L.B.”), born October 27, 2004, dependent and transferring their custody to relatives. We affirm.
 

 Procedural History
 

 On February 11, 2008, the Calhoun County Department of Human Resources (“DHR”) filed petitions to transfer custody of the four children. DHR alleged in those petitions that DHR had held custody of the children since June 23, 2005; that the mother had failed to comply with reunification efforts; that it had located relatives who were fit and willing to take custody of the children; and that a transfer of custody to those relatives would be in the best interests of the children.
 

 On March 27, April 29, and April 30, 2008, the juvenile court conducted ore ten-us hearings on the petitions. On June 20, 2008, the juvenile court entered four final judgments, transferring custody of O.D.P. and T.J.T. to their paternal grandparents, R.Be. and V.Be. (“the paternal grandparents”), and transferring custody of T.M.T. and M.L.B. to their maternal aunt, C.A. (“the maternal aunt”). The juvenile court awarded the mother liberal visitation, which was to be supervised by DHR for the first six months. The juvenile court entered four amended judgments on its own motion on June 26, 2008. The mother timely appealed, arguing that the juvenile court had erred in transferring custody of her children to the relatives.
 

 Background
 

 The evidence at trial established that, in 2005, the mother, Ra.B., her then 12-year-old son, and the four children at issue resided with M.B., the mother’s husband and the biological father of T.M.T. and
 

 
 *200
 
 M.L.B.
 
 [1]
 
 The mother testified that M.B. had physically abused her on more than one occasion and that, after another violent episode, the mother had obtained a protection-from-abuse order against M.B.
 
 See
 
 Ala.Code 1975, § 30-5-1 et seq. On June 23, 2005, when the sheriff attempted to serve M.B. at the family’s home while the mother was working, the sheriff discovered that M.B. had left the children alone without adult supervision. The sheriff contacted DHR, who removed all the children from the home and initiated a protective-services case under the supervision of Alice Willis, a DHR social worker.
 

 After safeguarding the children, DHR initiated services aimed at resolving the issues of domestic violence and lack of adequate parental supervision. Willis testified that DHR had provided psychological evaluations for the mother, M.B., Ra. B., O.D.P., and T.J.T.; individualized therapy for the mother, Ra.B., O.D.P., and T.M.T.; basic living-skills training for Ra. B., O.D.P., and T.M.T.; and parenting-skills training for the mother.
 

 Kirsten Stephenson, who had been the mother’s counselor since July 2005, testified that the mother suffered from post-traumatic stress disorder and bipolar disorder, for which she had been prescribed various psychiatric medications. In addition to those conditions, Stephenson testified that, in counseling the mother on proper parenting techniques, “we had to start at ground zero with parenting with her.” The mother routinely attended therapy with Stephenson, but the mother originally resisted changing her lifestyle. The mother maintained her relationship with M.B., she conflicted with her in-home service providers to the point that they discontinued services, she unilaterally decided to stop taking her psychiatric medications, and she refused to acknowledge the impact of the domestic violence on the children.
 

 While the mother was not complying with the terms of the reunification agreement she had reached with DHR, all the children resided either together or in smaller groups at the homes of various relatives, including the paternal grandparents and the maternal aunt, and, on one occasion, in the Baptist Children’s Home for three months.
 
 [2]
 
 The mother visited with the children, but only under supervision by Covenant Services. While out of the mother’s custody in 2006, T.M.T. and O.D.P. accused Ra.B. of having acting sexually inappropriately with T.M.T. and T.J.T.,
 
 [3]
 
 including on one occasion while attending supervised visitation with the mother. Willis testified that she informed the children’s counselors of the allegations but that she did not take any action to separate the children at the time. Willis explained that, due to her age and verbal skills, T.M.T. could not make a valid report. Moreover, Willis had believed at the time that anyone under the age of 14— Ra.B. was then 13 — was not old enough to be considered responsible for sexual abuse.
 
 [4]
 
 Willis testified that, when she was
 
 *201
 
 informed of the allegations, the mother stated that the girls often told stories on Ra.B. and tried to get him in trouble. The mother stated that that was just how the children played. Willis testified that she and the mother had also discussed claims made by several female schoolmates that Ra.B. had touched them inappropriately; according to Willis, the mother had claimed that those girls were lying.
 

 The mother testified that she eventually ended her relationship with M.B.; however, at the time of the trial she had not divorced M.B. and they remained married. Stephenson testified that after that relationship ended, which occurred about a year and a half before the March 27, 2008, custody hearing, the mother began to progress significantly in her therapy. In November 2006, DHR formulated an individualized service plan (“ISP”) notifying the mother of the goals she needed to achieve to obtain physical custody of the children. The mother testified that she had achieved all those goals. Willis also testified that the mother had satisfied all the ISP goals.
 

 Based on the mother’s progress, the children were returned to her physical custody in May 2007, but DHR remained involved with the family. On May 22, 2007, DHR and the mother entered into another ISP. Under that agreement, the mother was required to keep DHR informed of her current address, telephone number, and employment status; to cooperate in a nonhostile manner with DHR and all service providers; to maintain safe, stable, clean, and appropriate housing with working utilities for the children; to maintain reliable transportation; to continue counseling with Stephenson three times a month and to follow her recommendations; to not violate any laws; to submit to random drug screens, if requested;
 
 [5]
 
 to keep DHR informed of all persons with whom the mother was residing; and to ensure that O.D.P., who had been diagnosed with a learning disability and attention deficit/hyperactivity disorder (“ADHD”) and who had been suspended from school on multiple occasions due to anger-management issues, continued attending tutoring through Sylvan Learning Center up to a specified date.
 

 The record contains no indication of any problems arising from the mother’s custody of the children until September 2007.
 
 [6]
 
 At that time, T.M.T.’s counselor reported that T.M.T. was again accusing Ra.B. of sexually abusing her and T.J.T.
 
 [7]
 
 Because Ra.B. had turned 14, Willis initiated a formal investigation. The mother informed Willis that she believed T.M.T. and T.J.T. were just trying to get Ra.B. into trouble. However, while the investigation proceeded, Willis arranged for the four youngest children to be removed from the mother’s home. O.D.P. and T.J.T. returned to their paternal grandparents’ home, while T.M.T. and M.L.B. returned to their maternal aunt’s home. Ra.B. remained in the mother’s home.
 

 
 *202
 
 Both T.M.T. and T.J.T. submitted to multiple forensic evaluations conducted by two different employees of the Calhoun/Cleburne Children’s Center. In addition, T.M.T. underwent a medical evaluation. The forensic interviewers concluded that T.M.T. and T.J.T. both had obtained advanced sexual knowledge, as indicated by their graphic description of sexual acts. However, both girls made such inconsistent statements that their allegations could not be considered credible. The medical evaluation proved that T.M.T. had not been sexually assaulted as she claimed. Based on those findings, DHR determined that the sexual-abuse allegations were “not indicated.” The mother testified, and Willis confirmed, that DHR did not inform her of its determination. The interviewers both clarified that, although the girls were not credible witnesses, that did not mean that they had not been sexually abused. One interviewer had recommended that T.J.T. receive continued counseling for possible sexual abuse. Willis further explained that a “not indicated” report does not conclusively establish that sexual abuse has not occurred.
 

 Carl Barnes, Ra.B.’s counselor, opined that Ra.B., who even the mother admitted had been sexually active at age 13, did not recognize appropriate sexual boundaries. In October 2007, Willis arranged for Ra.B. to be tested to determine the extent of his sexual dysfunction and to determine the appropriate facility for treatment. According to Willis, the testing revealed that Ra.B. was not a sexual predator but that he would take advantage of sexual opportunities when they presented themselves. Stephenson referred to Ra.B. as “sexually reactive.” Accordingly, Ra.B. did not meet the standards to be placed in a sexual-offender program, but he could benefit from a behavioral-modification program. The mother testified that if Ra.B. needed help, she wanted him to get it. Willis identified Hill Crest Residential Facility as an appropriate treatment provider, but it had no space available for Ra.B. until March 2008; Ra.B. enrolled in Hill Crest in March 2008, and he remained in treatment there at the time of the trial, although he visited the mother’s home on passes.
 

 DHR did not return the four youngest children to the mother’s custody after completing its investigation of the sexual-abuse allegations and enrolling Ra.B. into Hill Crest. Willis testified that DHR had decided that it would be in the best interests of those children to transfer custody to the paternal grandparents and the maternal aunt. When questioned as to why DHR had not simply removed Ra.B. and allowed the four youngest children to remain in the custody of the mother, Willis explained that DHR ordinarily works to reunify families for 15 months but that DHR had been involved with the family for almost 3 years. Willis believed that, despite DHR’s rehabilitation efforts, the mother still could not adequately protect the children and properly control their behavior. Willis noted that Ra.B. had been accused by multiple persons of sexual misconduct, which accusations the mother refused to believe; that O.D.P. had been suspended or detained at school on multiple occasions due to uncontrolled angry outbursts; and that T.M.T. and T.J.T. often lied and had exhibited sexually suggestive and attention-seeking behavior. Willis maintained that the mother could not help the children mold their conduct because the mother insisted that they behaved normally. Willis admitted that she had received a note from Stephenson, dated March 19, 2008, in which Stephenson had stated that she believed the mother’s progress during the last year warranted another attempt at reunification with the children. However, Willis testified that, because DHR had al
 
 *203
 
 ready made the decision to pursue transfer of custody to relatives, DHR had taken no action in response to Stephenson’s note.
 

 At the trial, the mother testified that she wanted the children returned to her custody. The mother believed that she could effectively parent all the children with the assistance of adult relatives to babysit while she was working. The mother stated that she loved the children and that she would take all necessary steps to protect them and to ensure that no inappropriate sexual conduct occurred. The mother presented testimony from friends indicating that she was capable of properly parenting the children.
 

 Stephenson testified that, although the mother had been very compliant with counseling, had made a great deal of progress, and could recite the parenting concepts “backwards and forwards,” the mother still had trouble properly implementing what she had learned. Stephenson opined that, because of her inconsistency and poor judgment, the mother lacked the capacity to parent all five children properly. Stephenson believed that Ra.B. should be removed from the home to avoid the risk of sexual misconduct. However, even with Ra.B. removed, Stephenson believed that the mother could effectively parent the children only with continued close supervision and counseling. Stephenson estimated that the mother was only 70% rehabilitated but that she could soon achieve total rehabilitation with the services DHR was providing.
 

 The children’s counselors opined that it would be in the best interests of the children to remain in the custody of their relatives, subject to liberal visitation with the mother. T.J.T.’s counselor stated that T.J.T. should reside with the paternal grandparents but that she should not reside with O.D.P. because T.J.T. had accused him of sexual abuse; however, the counselor appeared confused on the identity of the alleged perpetrator, which she also identified as the “older brother.” The counselor was alarmed about the scope of T.J.T.’s sexual knowledge, which had continued to increase over the course of TJ.T.’s treatment, but she was unable to determine the source of that knowledge.
 
 [8]
 
 The counselor for O.D.P. believed that, despite the mother’s best efforts, O.D.P. had regressed while under the mother’s care and that it would be best for him to stay with his paternal grandmother and in the school system to which he had adapted.
 

 The maternal aunt testified that she believed it to be in the best interests of T.M.T. and M.L.B. to remain in her custody. The maternal aunt acknowledged that T.M.T. tended to lie and misbehave at times in school, but she testified that she was dealing with those problems. The maternal aunt did not believe that the mother was ready to assume a parenting role. V.Be., O.D.P. and T.J.T.’s paternal grandmother, testified that when she and R.Be. first assumed care of O.D.P. in 2006, he was educationally behind and displayed oppositional behavior in their home, sometimes even violently, and in school. Under their care, and with proper medication and counseling, his reading level and conduct had improved; however, after returning from his mother’s care in October 2007, O.D.P. had regressed. After receiving
 
 *204
 
 firm guidance from R.Be. and starting baseball, O.D.P. had begun to again show improvement. V.Be. testified that T.J.T. was a sweet girl who was very fragile and sensitive and who had trouble with telling lies.
 

 Issues
 

 The mother basically argues that the juvenile court erred in awarding custody of the children to the paternal grandparents and the maternal aunt. The mother contends that, because she complied with all DHR’s reunification requirements and because the allegations against Ra.B. proved false, the juvenile court, pursuant to its duty to preserve and reunite families, was compelled to award her custody. The mother further argues that the juvenile court erred in ordering DHR to cease reunification efforts when, she says, success appeared imminent. Finally, the mother argues that the juvenile court erred in finding that it was in the best interests of the children to be separated and placed with the paternal grandparents and the maternal aunt.
 

 Reasonable Reunification Efforts
 

 When a child is removed from the custody of his or her parents due to dependency, the juvenile court has a duty in most cases to exert reasonable efforts to reunite the family as quickly and safely as possible. Ala.Code 1975, § 12-15-1.1(3). In order to continue placement of a child outside his or her home, the juvenile court must find, “if warranted by the evidence”:
 

 “(1) That continuing the placement of a child in his or her home would be contrary to the best interests of the child.
 

 “(2) That reasonable efforts have been made to prevent or eliminate the need for removal of the child from his or her home, or that an emergency situation exists which requires the immediate temporary removal of the child from his or her home and that it is reasonable not to make efforts to prevent removal of the child from his or her home due to the emergency situation.
 

 “(3) That reasonable efforts have been made or will be made to reunite the child and his or her family, or that efforts to reunite the child and his or her family have failed.”
 

 Ala.Code 1975, § 12-15-65(g).
 

 “Reasonable efforts” include “efforts ... to make it possible for a child to return safely to the child’s home,” Ala. Code 1975, § 12-15-65(m), such as efforts to rehabilitate the parent so that the parent can “again exercise familial rights and responsibilities toward the child in question.”
 
 Miller v. Alabama Dep’t of Pensions & Sec.,
 
 374 So.2d 1370, 1374 (Ala.Civ.App.1979);
 
 see also D.M.P. v. State Dep’t of Human Res.,
 
 871 So.2d 77, 89 n. 10 (Ala.Civ.App.2003) (plurality opinion). Whether efforts at reunification have been reasonable and whether those efforts have failed or succeeded are questions of fact for the juvenile court to determine.
 
 T.B. v. Cullman County Dep’t of Human Res.,
 
 6 So.3d 1195, 1199 (Ala.Civ.App.2008).
 

 “In making that determination, the juvenile court must first identify the parental conduct, circumstances, or condition that led to the removal of the children and prevented their return to the custody of the parent.... The juvenile court must then consider the efforts expended by the parent in overcoming those problems and the progress the parent has made in eliminating or reducing those problems, so that they no longer constitute a barrier to reunification.”
 

 T.B.,
 
 6 So.3d at 1199.
 

 The evidence contained in the record indicates that the children were originally
 
 *205
 
 removed from the mother due to concerns regarding domestic violence and lack of adequate parental supervision. DHR eventually returned the children to the mother, with certain conditions outlined in a May 22, 2007, ISP. The mother argues that because she complied with those conditions, the juvenile court should have concluded that reasonable efforts at reunification had succeeded. We cannot agree.
 

 In assessing the success of reasonable efforts at reunification, the juvenile court is not limited to determining solely whether the parent has complied with the reunification plan or conditions established by DHR.
 
 See, e.g., B.L.T. v. V.T.,
 
 12 So.3d 123 (Ala.Civ.App.2008) (notwithstanding evidence of mother’s compliance with DHR’s requests, the juvenile court could properly transfer custody of child to relative based on other evidence indicating that the mother had neither the maturity nor the emotional stability to effectively parent the child). A juvenile court may consider such compliance, but only as part of its inquiry as to whether the parental conduct, condition, or circumstances that required separation of the child have been satisfactorily eliminated.
 
 See H.H. v. Baldwin County Dep’t of Human Res.,
 
 989 So.2d 1094, 1104-05 (Ala.Civ.App.2007) (Moore, J., with Thompson, P.J., and Bryan, J., concurring in the result, and Pittman and Thomas, JJ., dissenting). A parent may follow the plan faithfully yet still remain unable to properly parent the child.
 
 See, e.g., B.L.T., supra.
 

 In this case, the juvenile court had before it evidence indicating that, despite her compliance with the May 22, 2007, ISP, the mother still had not demonstrated the consistency and judgment to properly parent the children independently. Stephenson testified that the mother had not fully rehabilitated because she still experienced difficulty in implementing parenting concepts, stating that the mother could effectively parent the children only with continued close supervision and counseling. Willis testified that the mother insisted that the children behaved normally, despite the evidence to the contrary. O.D.P.’s counselor testified that O.D.P. had regressed in the mother’s care, which V.Be. corroborated in her testimony. The maternal aunt also testified that she did not believe the mother was ready to resume her parenting role.
 

 The mother presented testimony indicating that she could, in fact, parent the children properly. However, in reviewing a juvenile court’s factual finding that reasonable efforts at rehabilitation and reunification have failed, this court follows the ore tenus rule.
 
 See T.B., supra.
 
 When the evidence is conflicting, the court presumes that the finding supporting the juvenile court’s judgment is correct.
 
 See Ex Parte P.G.B.,
 
 600 So.2d 259, 261 (Ala.1992). The court will not reverse the juvenile court’s judgment unless the findings supporting that judgment are so poorly supported by the evidence as to be plainly and palpably wrong.
 
 See Ex Parte Walters,
 
 580 So.2d 1352 (Ala.1991). Based on that standard of review, we find that the juvenile court could have reasonably concluded that reasonable efforts to reunite the family through parental rehabilitation had failed to alleviate satisfactorily the parental conduct, condition, and circumstances that had led to the separation of the family.
 

 In reaching that conclusion, we reject the mother’s contention that the family remains separated solely based on false allegations of sexual abuse. As set out above, the evidence shows that, even in the absence of sexual abuse in the home environment, the juvenile court had ample other grounds for concluding that reuniting the family was not in the best interests of
 
 *206
 
 the children. Moreover, we do not equate the “not indicated” finding with a determination that Ra.B. had been falsely accused. DHR makes a finding of “not indicated” “[w]hen credible evidence and professional judgment do[] not substantiate that an alleged perpetrator is responsible for child abuse or neglect.” Ala.Code 1975, § 26-14-8(a)(2). As Willis testified, that finding does not conclusively establish that the alleged abuse did not occur. The forensic interviewers also testified that, although T.M.T. and T.J.T. were not credible witnesses, that did not mean that they had not been abused.
 

 We also reject the mother’s argument that the juvenile court should not have discontinued reunification efforts. First, we do not necessarily agree that the juvenile court ordered DHR to cease reunification services. Although the judgments indicate that the juvenile court ordered DHR to close its file, the judgments also required DHR to supervise the mother’s visitation for six months. Furthermore, the judgments did not specifically order DHR to cease providing counseling and other services to the mother or the children.
 

 Secondly, we note that the law requires only that the juvenile court use “reasonable efforts” to reunite the family. Willis testified that DHR ordinarily works with families toward reunification for 15 months,
 
 [9]
 
 whereas DHR had been attempting to rehabilitate the mother so that she could reunite with the children for 34 months at the time of the trial. Stephenson indicated that the mother was nearing completion of the rehabilitation process. Based on that testimony, the juvenile court would have been justified in extending the reunification process even further,
 
 cf. M.A.J. v. S.F.,
 
 994 So.2d at 280, 291 (Ala.Civ.App.2008) (noting that juvenile court may extend rehabilitation period when the evidence establishes that a limited additional amount of time or effort will necessarily result in the rehabilitation of the parent and accomplishment of the goal of family reunification), but the juvenile court was not compelled to do so.
 

 This court has repeatedly recognized that sustained efforts at rehabilitation of the parent must be balanced against the child’s need for permanency and stability.
 
 See, e.g., T.B.,
 
 6 So.3d at 1202;
 
 J.W.M. v. Cleburne County Dep’t of Human Res.,
 
 980 So.2d 432, 440 (Ala.Civ.App.2007);
 
 Talladega County Dep’t of Human Res. v. M.E.P.,
 
 975 So.2d 370, 374 (Ala.Civ.App.2007); and
 
 D.G. v. State Dep’t of Human Res.,
 
 569 So.2d 400, 403 (Ala.Civ.App.1990). At some point the child’s need for permanency and stability overcomes the parent’s right to continued rehabilitation.
 
 M.W. v. Houston County Dep’t of Human Res.,
 
 773 So.2d 484, 487 (Ala.Civ.App.2000). Evidence in the record indicates that, at the time of the trial, that point had been reached. Thus, we cannot conclude that the juvenile court would have committed reversible error by ordering DHR to cease further efforts at reunification.
 

 Best Interests of the Children
 

 Upon a finding that reasonable efforts at family reunification have failed, a juvenile court may make any disposition that serves the best interests of the child, Ala.Code 1975, § 12 — 15—71(a)(4), including transferring legal custody of the child to a relative, who, after study by DHR, is
 
 *207
 
 found to be qualified to receive and care for the child. Ala.Code 1975, § 12-15-71(a)(3)c.
 

 “In
 
 Ex parte Alabama Department of Human Resources,
 
 682 So.2d 459 (Ala.1996), the Alabama Supreme Court stated the applicable principles of appellate review in the context of a challenge to a juvenile court’s custodial disposition of a dependent child:
 

 “ ‘Appellate review is limited in cases where the evidence is presented to the trial court ore tenus. In a child custody case, an appellate court presumes the trial court’s findings to be correct and will not reverse without proof of a clear abuse of discretion or plain error.
 
 Reuter v. Neese,
 
 586 So.2d 232 (Ala.Civ.App.1991);
 
 J.S. v. D.S.,
 
 586 So.2d 944 (Ala.Civ.App.1991). This presumption is especially applicable where the evidence is conflicting.
 
 Ex Parte P.G.B.,
 
 600 So.2d 259, 261 (Ala.1992). An appellate court will not reverse the trial court’s judgment based on the trial court’s findings of fact unless the findings are so poorly supported by the evidence as to be plainly and palpably wrong. See
 
 Ex Parte Walters,
 
 580 So.2d 1352 (Ala.1991).’
 

 “682 So.2d at 460.”
 

 J.J. v. J.H.W.,
 
 [Ms. 2061197, October 10, 2008] — So.3d -, - (Ala.Civ.App.2008).
 

 In this case, the juvenile court heard evidence, albeit conflicting, indicating that, although the children continued to deal with separation issues and other emotional issues while in their relatives’ care, the children had adapted to their relative placements and had experienced less behavioral problems in those placements than they had experienced while in their mother’s care. The children’s counselors uniformly opined that the best interests of the children would be served in the care of the relatives. O.D.P. and T.J.T.’s paternal grandmother and the maternal aunt testified before the juvenile court as to their ability and willingness to meet the children’s specialized needs. Under the ore tenus standard of review, we defer to the juvenile court’s resolution of the disputed facts and to the juvenile court’s determination of the children’s best interests.
 

 The mother last argues that it is not in the best interests of the children to be separated. Although Alabama law does not favor separating siblings, that general disfavor does not appear to apply to half siblings.
 
 See Hannan v. Hannan,
 
 676 So.2d 1340, 1342 (Ala.Civ.App.1996). The juvenile court placed O.D.P. and T.J.T., who are full siblings, with their paternal grandparents. Their half siblings, T.M.T. and M.L.B., who are full siblings in relation to one another, were placed with their maternal aunt. Hence, the juvenile court did not separate any full siblings from one another. Besides stating the general principle against separation of siblings, the mother makes no other argument that the best interests of the children will be adversely affected by their separation. Thus, we need not consider that argument further.
 

 Conclusion
 

 For the foregoing reasons, we affirm the juvenile court’s judgments transferring custody of O.D.P. and T.J.T. to their paternal grandparents and transferring custody of T.M.T. and M.L.B. to their maternal aunt.
 

 AFFIRMED.
 

 PITTMAN and THOMAS, JJ., concur.
 

 THOMPSON, P.J., and BRYAN, J„ concur in the result, without writings.
 

 [1]
 

 . The mother testified that O.D.P. and T.J.T. shared a another father, O.D.P., Sr., and that Ra.B. had been fathered by her uncle, G.T.
 

 [2]
 

 . The mother obtained physical custody of the children in early 2006 for one night. The mother testified that she got the children with the consent of DHR, but Willis testified that DHR had not consented to the transfer of custody. Willis obtained the children the next day and arranged for them to live in the Baptist Children's Home until the children could be placed with relatives.
 

 [3]
 

 . T.J.T. also reported sexual abuse by Ra.B. to her counselor, but the record is unclear as to when those reports were made.
 

 [4]
 

 . On cross-examination, Willis admitted that, according to DHR manuals, a person could be held responsible for sexual abuse at the age of 12 years.
 

 [5]
 

 . The mother was to undergo random drug screens, but, by the time of the trial, DHR had not requested any recent drug screens because the mother had not tested positive for illegal drugs since 2005.
 

 [6]
 

 . Stephenson testified that the mother had been stressed when all five children were in the home and that the mother had missed some counseling sessions due to her hectic schedule. Stephenson also testified that the mother depended on relatives to help her with the children. However, the record contains no evidence of any specific problems with the mother's care.
 

 [7]
 

 .Although the counselor reported allegations involving O.D.P. as well, Willis denied that T.M.T. had ever made an allegation of abuse against O.D.P.
 

 [8]
 

 . It was undisputed by all witnesses that T.J.T. and T.M.T.’s sexual knowledge and behaviors continued to increase during the time that they were out of the mother’s home and while they were having only supervised visitation with the mother. From where this information was coming was never adequately explained at the trial. O.D.P. and TJ.T.’s paternal grandmother denied that T.J.T. had learned sexual information in her home. The maternal aunt also could not determine the source of T.M.T.'s knowledge.
 

 [9]
 

 . We note that in cases in which a child is placed in foster care, the law presumes that 12 months is a reasonable time to complete the rehabilitation process for the purposes of reunification.
 
 M.A.J. v. S.F.,
 
 994 So.2d 280, 291 (Ala.Civ.App.2008). We do not apply that presumption in this case, which does not involve foster-care placement, but we find the 12-month limitation instructive in assessing the reasonableness of DHR’s nearly 3-year efforts to rehabilitate the mother.