THOMAS, Judge.
D.M. a/k/a D.S. (“the mother”) appeals the August 13, 2013, judgments of the Limestone Juvenile Court, which terminated her parental rights to S.M. (“the son”), case no. JU-11-151.02; J.S. (“the middle child”), case no. JU-11-150.02; and S.S. (“the youngest child”), case no. JU-11-149.02. (The son, the middle child, and the youngest child are hereinafter referred to collectively as “the children.”) Z.M. is the father of the son; R.S., the mother’s ex-husband, is the father of the middle child and the youngest child (hereinafter referred to collectively as “the daughters”).[1] For clarity, we note at the outset of this opinion that the children frequently moved between various homes between 2010 and the time of the termination trial, and, during the majority of that period, the son *1167 was separated from the daughters due to his behavioral issues, which we discuss infra. At the time of the termination-of-parental-rights trial, the son lived with R.H. (“the maternal grandmother”) and her husband, who were willing to adopt the children or to accept their “temporary or permanent” placement, and the daughters lived with foster parents who 'wished to adopt them.
The Limestone County Department of Human Resources (“DHR”) became involved with the family in 2010 after it received reports of domestic violence and child abuse;[2] at that time the mother was 24 years old.[3] On November 9, 2011, the juvenile court adjudicated the children dependent and placed them in the custody of DHR. Thereafter, at different times, the children lived together or separately with the mother and R.S., with the mother alone, with the maternal grandmother and her husband, with the mother and her grandmother (“the great-grandmother”), or with foster parents.
In January 2013 the juvenile court entered an order granting DHR’s motion to be relieved of the duty to provide reunification efforts. On February 7, 2013, DHR filed petitions seeking the termination of the mother’s parental rights to the children. The juvenile court set a review hearing regarding disposition of the children for February 8, 2013. The termination-of-parental-rights trial was held on July 29 and July 30, 2013, and, on August 13, 2013, the juvenile court entered separate judgments terminating the mother’s parental- rights to the children. Custody of the children was placed with DHR for adoptive placement.
The juvenile court’s judgments included determinations that the children were dependent, which the mother has not challenged on appeal. The juvenile court noted the following factors supporting its determination that the mother’s parental rights to the son should be terminated— that the mother suffered from an emotional illness, that DHR’s reasonable efforts at reunification had failed, that the mother had not provided support'for the son, and that the mother had' failed to adjust her circumstances to meet the son’s needs. Regarding viable alternatives, the juvenile court’s judgment reads:
“The Court further finds that there are no viable alternatives to termination of the parental rights of the mother. [The son] has previously been diagnosed with autism and has special behavioral, educational and emotional needs. He has lived with [the] maternal grandmother and [her husband] off and on for most of his life. He is in a special class in school and the [maternal] grandmother has worked with him to improve his emotional behavior. DHR has an- *1168 nouneed that [its] plan for [the son] is grandparent adoption.”
Regarding the daughters, the juvenile court determined that the mother was unable or unwilling to discharge her responsibilities to and for the daughters and that her conduct or condition was unlikely to change in the foreseeable future, that the mother had abandoned the daughters, that the mother suffered from an emotional and mental illness and had failed to avail herself of treatment, that DHR’s reasonable efforts at reunification had failed, that the mother had failed to provide support for the daughters, that the mother had failed to visit or maintain regular contact or communication with the daughters, that the mother had made no “real effort” to adjust her circumstances to meet the needs of the daughters, and that no viable alternative to the termination of the mother’s parental rights existed.
Without filing postjudgment motions, the mother filed notices of appeal on August 27, 2013, seeking this court’s review of whether the juvenile court’s judgments are supported by clear and convincing evidence,[4] whether DHR made reasonable efforts to reunite the family, and whether a viable alternative to the termination of the mother’s parental rights existed.
“This court’s standard of appellate review of judgments terminating parental rights is well settled. A juvenile court’s factual findings, based on ore tenus evidence, in a judgment terminating parental rights are presumed to be correct and will not be disturbed unless they are plainly and palpably wrong. See, e.g., F.I. v. State Dep’t of Human Res., 975 So.2d 969, 972 (Ala.Civ.App.2007). Under express direction from our supreme court, in termination-of-parental-rights cases this court is ‘required to apply a presumption of correctness to the trial court’s finding[s]’ when the trial court bases its decision on conflicting ore ten-us evidence. Ex parte State Dep’t of Human Res., 834 So.2d 117, 122 (Ala.2002) (emphasis added). Additionally, we will reverse a juvenile court’s judgment terminating parental rights only if the record shows that.the judgment is not supported by clear and convincing evidence. F.I., 975 So.2d at 972.”
J.C. v. State Dep’t of Human Res., 986 So.2d 1172, 1183 (Ala.Civ.App.2007) (footnote omitted).
We first consider whether clear and convincing evidence supports the juvenile court’s judgments terminating the mother’s parental rights to the children. Alabama’s juvenile courts may terminate parental rights only when the evidence presented is “clear and convincing evidence, competent, material, and relevant in nature.” § 12-15-319(a), Ala.Code 1975.
Pam Burkett, an employee of Family Counseling Associates, testified that she had been retained by DHR to counsel the mother regarding “low self-esteem issues, stress management, healthy relationships, domestic violence and its impact on children as well as its impact on her, and depression and anxiety.” She said: “I don’t feel like we made significant progress.” Burkett said that counseling the mother was difficult because the mother had often canceled the in-home appointments, and, she stated, because the daughters were present, the appointments were “anything but calm.” (At the time, the son lived with the maternal grandmother and her husband.) Burkett said that the moth *1169 er’s discipline was “very lax” and that the daughters were “running wild” and did not listen to the mother; she said that the middle child, who was preschool age, had used profanity, which the youngest child “parrot[ed].” Burkett testified that the mother had told her that she had allowed a 16-year-old male neighbor to come into her home and play video games with the daughters and that the neighbor had asked the mother to have sex with him. At Burkett’s request, the mother had agreed not to allow the neighbor in the house, but, Burkett said, the mother had not understood the potential safety risk to the daughters.
Amanda Simpson, a family-support worker with Family Counseling Associates, testified that DHR had employed her to counsel the mother. Simpson testified that the mother had successfully obtained “Section 8” federally subsidized housing; however, Simpson said that the mother had made very little, if any, progress at budgeting, housekeeping, parenting, and maintaining employment. Simpson said the mother’s depression seemed “almost manic occasionally.” She said that she was concerned that the mother tended to put relationships with men ahead of her responsibilities for the children and that she had observed the middle child playing with a doll in a way that appeared to be sexual.
Sara Gilbert, a DHR employee, testified that in September 2012 she had discovered a man hiding in the mother’s home at 8:15 a.m. The mother admitted that she had met the man the night before and had allowed him to stay in her home overnight. Thereafter, the mother expressed suicidal thoughts to Gilbert, and the mother was hospitalized. As a result, Gilbert said, the juvenile court issued a pickup order, and the daughters were placed in foster care.[5]
The mother testified that she had lived with the great-grandmother for seven months before the termination trial, that she had a job, and that the children were not living with her. As an indicator of her progress toward being able to parent the children, the mother said that, in the six months before the termination-of-parental-rights trial, she had started going to church on Wednesdays and Sundays to “change [herjself.” Testimony also indicated that the mother had attended the Individualized Service Plan (“ISP”) meetings and that she had tested negative for illegal drugs.
Section 12 — 15—319(a), Ala.Code 1975, provides, in pertinent part:
“(a) If the juvenile court finds from clear and convincing evidence, competent, material, and relevant in nature, that the parents of a child are unable or unwilling to discharge their responsibilities to and for the child, or that the conduct or condition of the parents renders them unable to properly care for the child and that the conduct or condition is unlikely to change in the foreseeable future, it may terminate the parental rights of the parents. In determining whether or not the parents are unable or unwilling to discharge their responsibilities to and for the child and to terminate the parental rights, the juvenile court shall consider the following factors including, but not limited to, the following:
[[Image here]]
“(2) Emotional illness, mental illness, or mental deficiency of the parent, or excessive use of alcohol or *1170 controlled substances, of a duration or nature as to render the parent unable to care for needs of the child.
[[Image here]]
“(9) Failure by the parents to provide for the material needs of the child or to pay a reasonable portion of support of the child, where the parent is able to do so.
[[Image here]]
“(11) Failure by the parents to maintain consistent contact or communication with the child.
“(12) Lack of effort by the parent to adjust his or her circumstances to meet the needs of the child in .accordance with agreements reached, including agreements reached with local departments of human resources or licensed child-placing agencies, in an administrative review or a judicial review.”
The mother testified that she suffered from untreated depression. See § 12-15-319(a)(2). She said that' she had failed to provide support for the son while he was living with the maternal grandmother and for the daughters while they were in foster care. See § 12-15-319(a)(9). She said that she had contacted DHR once during the seven months she had lived in Chicago, see supra note 5, and she said: “I asked [the DHR employee] how the girls were and did they ever ask about me, and she said ‘no’.” See § 12-15-319(a)(ll). Finally, she agreed that she had failed to adjust her circumstances to meet the needs of the children. See § 12 — 15—319(a)(12). Therefore, even without consideration of the testimony provided by Family Counseling Associates staff and DHR employees, clear and convincing evidence presented by the mother herself supports the juvenile court’s conclusion that grounds supporting its termination the mother’s parental rights to the children existed.
Next, we consider whether the juvenile court erred by concluding that DHR made reasonable efforts to reunite the family.
“ ‘Reasonable efforts’ include ‘efforts ... to make it possible for a child to return safely to the child’s home,’ Ala. Code 1975, § 12-15-65(m), such as efforts to rehabilitate the parent so that the parent can ‘again exercise familial rights and responsibilities toward the child in question.’ Miller v. Alabama Dep’t of Pensions & Sec., 374 So.2d 1370, 1374 (Ala.Civ.App.1979); see also D.M.P. v. State Dep’t of Human Res., 871 So.2d 77, 89 n. 10 (Ala.Civ.App.2003) (plurality opinion). Whether efforts at reunification have been reasonable and whether those efforts have failed or succeeded are questions of fact for the juvenile court to determine. T.B. v. Cull- . man County Dep’t of Human Res., 6 So.3d 1195,1199 (Ala.Civ.App.2008).
“ ‘In making that determination, the juvenile court must first identify the parental conduct, circumstances, or condition that led to the removal of the children and prevented their return to the custody of the parent.... The juvenile court must then consider the efforts expended by the parent in overcoming those problems and the progress the parent has made in eliminating or reducing those problems, so that they no longer constitute a barrier to reunification.’
“T.B., 6 So.3d at 1199.”
R.T.B. v. Calhoun Cnty. Dep’t of Human Res., 19 So.3d 198, 204 (Ala.Civ.App.2009).
The record indicates that DHR held ISP meetings, which the mother attended. The mother testified that DHR had provided a psychological evaluation, parenting classes, and counseling services through “Crisis Services” and with Rita Friga, who *1171 was employed by the Focus Program (“FOCUS”), which is an agency employed by DHR that had offered the mother six months of free “in-home services for preservation and unification” of the family. Friga said that, when she began working with the mother, the mother and the children lived with the maternal grandmother and R.S. lived in Chicago. Friga said that the mother had made very little progress. The mother said that working with Friga made her feel overwhelmed and stressed, although she testified that the parenting techniques she had learned from Friga were effective. The mother admitted that she “didn’t follow through.” Erin Heath-erly, a DHR employee, said that Friga had “reached a point ... where [she] was no longer able to get in touch with [the mother].” The mother said that Friga had explained the reasons for terminating the in-home services in January 2011 and that the mother had understood and agreed with Friga’s decision. The mother said that she had wanted to learn from Friga but that her depression had prevented her from giving her attention to the daughters.
Heatherly further testified that DHR had asked the mother to submit to a parental-capacity assessment and that the mother had complied. Heatherly said that the mother had started the “SAIL” program for victims of domestic violence and had resided in a victims’ shelter for a period. The mother said that DHR had recommended treatment at a mental-health center for her depression but that the treatment was too expensive. Gilbert testified that the mother had attended a women’s domestic-violence-intervention program and that the mother had “requested that she [be allowed to pay for it] on her own.”
Based upon the testimony presented to it, the juvenile court reasonably concluded that DHR had expended reasonable efforts for three years that had failed to reunite the family. We have recognized that, “[a]t some point, ... the child’s need for permanency and stability must overcome the parent’s good-faith but unsuccessful attempts to become a suitable parent.” M.W. v. Houston Cnty. Dep’t of Human Res., 773 So.2d 484, 487 (Ala.Civ.App.2000).
Finally, we consider whether the juvenile court erred by determining that no viable alternative to the termination of the mother’s parental rights existed.
“‘A juvenile court is required to apply a two-pronged test in determining whether to terminate parental rights: (1) clear and convincing evidence must support a finding that the child is dependent; and (2) the court must properly consider and reject all viable alternatives to a termination of parental rights. Ex parte Beasley, 564 So.2d 950; 954 (Ala.1990).’
“B.M. v. State, 895 So.2d 319, 331 (Ala.Civ.App.2004).”
A.E.T. v. Limestone Cnty. Dep’t of Human Res., 49 So.3d 1212, 1216 (Ala.Civ.App.2010).
A generous reading of the mother’s appellate brief indicates three potential viable alternatives that the mother contends were not properly considered — placement of the children with the maternal grandmother, investigation of the great-grandmother or “other potential placement options” for the children, or maintenance of the status quo regarding the son. “The trial court must consider the best interest of the child when looking at less drastic alternatives” to termination of parental rights. Haag v. Cherokee Cnty. Dep’t of Pensions & Sec., 489 So.2d 586, 588 (Ala.Civ.App.1986). We examine each of the mother’s assertions in turn.
*1172 The juvenile court did not err by determining that placement of the daughters with the maternal grandmother, who was caring for the son, was not a viable alternative as to the daughters. The maternal grandmother said: “I love my grandchildren better than life itself, and I feel that they need to be with a family member versus being with foster parents and people that they don’t know.” She testified that she had taken care of the children in the past, that she could do so again, and that the son had asked to see the daughters. She said that she was financially able to support the children. She said that she and her husband received a combined monthly income of $3,400, which Gilbert characterized as “limited” if the maternal grandmother’s family grew to a family of five; Gilbert also said that the maternal grandmother had not been truthful about monthly household expenses. For example, the maternal grandmother had testified that the gasoline expense for two vehicles was $80 per month, although she had admitted that she traveled to Birmingham up to three times per month for medical appointments.
The maternal grandmother testified that she used the following prescription medications: baclofen for muscle relaxation, Neurontin for fibromyalgia, Requip for restless-leg syndrome, Synthroid for a thyroid disorder, and patches for pain. She said that her husband took pain medication, alprazolam for treatment of post-traumatic stress disorder and a traumatic brain injury, and “a whole lot more.” The maternal grandmother admitted that her husband could get angry easily and that he sometimes screamed. On those occasions, the maternal grandmother said, she and the son went to another room or left the house.
Gilbert testified that “FOCUS actually recommended that [the son] would do best being a child in the home by himself, that it would be a stressor on him with the [daughters] in the home.” Testimony indicated that the son was progressing in a special-needs kindergarten class but that he had been isolated from other school children because he had displayed inappropriate behaviors, including exposing himself, stealing, hitting, and inappropriate kissing and touching of other children. The juvenile court could have reasonably concluded that placement of the son and the daughters with the maternal grandmother was not in the daughters’ best interests due to the son’s mental and behavioral problems that could endanger the daughters and because of concerns regarding the maternal grandmother’s finances, her health issues, and her husband’s health, anger, and anxiety issues.
Furthermore, the juvenile court did not err, as the mother asserts, by failing to consider the great-grandmother or “others.” Heatherly testified that she had asked the mother to complete a relative-resource form but that the mother had failed to comply with her request.
“Although DHR has a responsibility to investigate alternate relative placements for a child, that obligation does not entirely alleviate the responsibility of the parent who purports to oppose the termination of his or her parental rights of making DHR social workers aware of alternative placement possibilities.”
B.S. v. Cullman Cnty. Dep’t of Human Res., 865 So.2d 1188, 1197 (Ala.Civ.App.2003). In addition, Gilbert testified that the daughters’ great-aunt had been contacted and that she had said that she could not protect the children from R.S. because she was “terrified” of him. Thus, we find no error in the judgments regarding ter *1173 mination of the mother’s parental rights to the daughters.
However, we conclude that the juvenile court could not have properly decided that maintaining the status quo was not an acceptable alternative regarding the son. That finding is not supported by clear and convincing evidence; thus, the juvenile court erred by terminating the mother’s parental rights to the son. The mother asserts:
“The [son] had been placed with the maternal grandmother, and, according to testimony had begun to thrive in that setting. Taken in isolation, it would appear that there is strong evidence that there was [no] need to terminate the parental rights of the mother as to the [son] due to the fact that he was permanently placed with the maternal grandmother.”
After a painstaking examination of the record, we agree with the juvenile court that the son is dependent and that the mother is unable or unwilling to discharge her parental responsibilities to and for the son and that that condition is unlikely to change in the foreseeable future; however, a viable alternative to the termination of the mother’s parental rights to the son exists. We reach this conclusion in light of the fact that the juvenile court’s finding that no viable alternative exists is not supported by judgment itself, which also includes the specific findings that the maternal grandmother had been attentive to son’s special needs, that the mother had maintained regular visits and contact or communication with the son, and that the son’s “emotional behavior” had improved.
“ ‘This court fully recognizes the difficulty of cases such as this. Nevertheless, the termination of parental rights is a drastic measure, and we know of no means by which those rights, once terminated, can be reinstated. The evidence in these cases “does not rise to the level of being so clear and convincing as to support termination of the parental rights of the mother, such action being the last and most extreme disposition permitted by statute.” East v. Meadows, 529 So.2d 1010, 1012 (Ala.Civ.App.1988). See also L.A.T. v. State Dep’t of Human Resources, 588 So.2d 471 (Ala.Civ.App.1991).’
“[V-M. v. State Dep’t of Human Res.], 710 So.2d [915,] 921 [ (Ala.Civ.App.1998) ].”
D.O. v. Calhoun Cnty. Dep’t of Human Res., 859 So.2d 439, 445 (Ala.Civ.App.2003).
For the reasons stated above, we affirm the judgments of the juvenile court terminating the parental rights of the mother to the daughters in case nos. 2121019 and 2121020, and we reverse the judgment of the juvenile court terminating the mother’s parental rights to the son in case no. 2121021; we remand case no. 2121021 for further proceedings consistent with this opinion.
2121019 — AFFIRMED.
THOMPSON, P.J., and PITTMAN and DONALDSON, JJ., concur.
MOORE, J., concurs in the result, without writing.
2121020 — AFFIRMED.
THOMPSON, P.J., and PITTMAN and DONALDSON, JJ., concur.
MOORE, J., concurs in the result, without writing.
2121021 — REVERSED AND REMANDED.
DONALDSON, J., concurs.
*1174 MOORE, J., concurs in the result, without writing.
THOMPSON, P.J., dissents, with writing, which Pittman, J., joins.

. The parental rights of Z.M. and R.S. were also terminated; however, neither father has appealed the judgments.

. The mother moved to Lauderdale County for a short period, and, during that period, the Lauderdale County Department of Human Resources reviewed, monitored, and provided services to the family.

. Leanne Jackson, a DHR employee, testified that in January 2010 she had investigated an-allegation that R.S., the mother’s then husband, had physically abused the mother and the son, who was four years old at the time. At the time of her investigation, Jackson observed a black eye and a bruise on the son’s face. Although R.S. denied that he had caused the injuries, DHR developed a safety plan for the family. The son was placed with the maternal grandmother, and the mother agreed to exercise supervised visitation; the daughters stayed- in the home with their parents. DHR issued a “not indicated” report regarding the abuse allegations against R.S. R.S. subsequently moved to Chicago, where, he candidly admitted, he was involved in the interstate trafficking of cocaine. At the time of the termination-of-parental-rights trial, the mother and R.S. had divorced.

. See Ex parte Mclnish, 47 So.3d 767 (Ala.2008) (explaining the standard of review to be used in evaluating whether the clear-and-convincing-evidence burden of proof has been met).

. Although the dates are not entirely clear, at some point the mother was released from the hospital and moved to Chicago, without the children, where she lived with R.S. for seven months.