THOMPSON, Presiding Judge.
 

 On July 30, 2007, the Calhoun County Department of Human Resources (“DHR”) filed a petition with the Calhoun Juvenile Court (“the trial court”), alleging that C.L.T. (“the child”) was a dependent child and requesting that DHR be granted custody of the child. At that time, the child was in the custody of his maternal grandmother, A.L.D. The trial court appointed a guardian ad litem to represent the child, and, after a shelter-care hearing, it transferred temporary custody of the child to DHR. On November 19, 2007, the trial court held an ore tenus hearing and entered an order finding that the child was dependent pursuant to § 12-15-1(1), Ala. Code 1975, and transferring custody of the child to DHR. After her postjudgment motion was denied by operation of law, A.L.D. timely appealed.
 

 The evidence in the record on appeal shows that the child was nearly two years old at the time DHR filed the dependency petition. At the November 19, 2007, hearing, it was undisputed that the identity of the child’s father had never been adjudicated. The child’s alleged father had been notified of the hearing but did not appear. N.T.F., the child’s mother, stipulated that she was not able to care for the child and that the child was dependent. N.T.F. and her husband, S.F., also stipulated to the dependency of their child, A.F., the child’s half brother. A.F. was born shortly before DHR filed its July 30, 2007, dependency petition. Only issues regarding C.L.T.’s dependency are relevant to this appeal.
 

 A.L.D. was present at the November 19, 2007, hearing; she challenged the allegation of dependency and sought to have custody of the child returned to her. The record does not clearly show how A.L.D. originally came to have custody of the child. It appears that DHR was not a party to any prior action regarding the child; counsel for DHR represented to the trial court that A.L.D. had filed a petition for custody of the child in 2006. In September 2006, when the child was approximately 14 months old, DHR prepared a document titled “Home Study for Circuit Court” (“the home study”). The parties agreed that the home study had been considered by the trial court and that A.L.D. had been granted custody of the child.
 

 The home study included information regarding A.L.D., her husband, J.D., and their home and living expenses. The home study stated that A.L.D. and J.D. had cared for the child since his birth.
 
 [1]
 
 The home study also included the following information regarding A.L.D. and J.D.
 

 “[A.L.D.] has no arrest history with Calhoun County or Anniston City. She was arrested in 2005, in Oxford, for [an] alleged domestic altercation between her and [J.D.]. The incident occurred about [N.T.F.], [AL.D.’s] daughter. [A.L.D.] threw [J.D.] on the floor and sat on him. She telephoned the police herself. They met court [sic] and the judge threw out the charge and ordered [A.L.D. and J.D.] to undergo counseling with Edith Couch.
 

 “[J.D.] has an arrest history in Pennsylvania due to DUI’s in the past. He was arrested by [a] State Trooper in 2004 for a DUI. He was referred by the court to undergo treatment/counseling for alcohol abuse. He completed the course on 8-26-06. ...
 

 
 *857
 
 [[Image here]]
 

 “Information in DHR files: [A.L.D.] has a long history with DHR off and on since 1989. The first report was of sexual abuse of [A.K.] ([A.L.D.’s] oldest son) by her boyfriend’s 9 year old daughter. [A.K.] was three at the time of the report. This incident was indicated. In 1999, a report of substantial risk of harm was indicated on [N.T.F.] due to [A.L.D.] having married [B.A.], a known sexual offender. [A.L.D.] left [B.A.] when she was made aware of his history. In September 2003, a report was made to the Lineville Police Department by [A.L.D.] that her boyfriend, [R.S.], had molested her daughter [N.T.F.], Both Clay and Calhoun Counties investigated the report. [R.S.] was a convicted sex offender and was found guilty of the charge.
 

 “Marital history: [A.L.D.’s] first marriage was to [B.A. from] 1995-1999. She has been married to [J.D.] since July 2004.
 

 “... [A.L.D.] has some mental limitations and receives SSI. She also suffers with depression.”
 

 In spite of DHR’s findings, the home study included a recommendation that A.L.D. be awarded custody of the child. The record does not contain any other information regarding the 2006 custody determination.
 

 N.T.F. gave birth to A.F. in July 2007; she was 19 years old at that time. Robin McNeal, a DHR child-abuse and neglect investigator, testified that she first investigated the family shortly after A.F. was born because N.T.F’s living conditions were unsafe. During her investigation, McNeal learned that A.F. had a two-year-old half brother who resided with his maternal grandmother, A.L.D. McNeal investigated A.L.D. as a possible resource for placement of A.F.
 

 A.L.D.’s home was suitable for the child and presented no immediate dangers, and the child showed no signs of abuse or neglect. However, McNeal discovered information regarding A.L.D. that had not been included in the 2006 home study, namely that A.L.D. had pleaded guilty to child endangerment in 2003. Based on that information, DHR filed its dependency petition regarding the child.
 

 At the November 19, 2007, hearing, A.L.D.’s counsel objected to the admission of any evidence regarding events in A.L.D.’s life that occurred before the 2006 home study. According to A.L.D., because the trial court had already considered the home study, DHR should be precluded from introducing evidence of those events on the basis of judicial estoppel. The trial court overruled A.L.D.’s objection, and it received ore tenus evidence regarding A.L.D.’s past.
 

 That evidence showed that A.L.D. was abused as a child by her parents, both physically and verbally. A.L.D. testified that in 2003 or 2004 her parents threatened to kill her. In 1989, A.L.D.’s son was molested by her boyfriend’s young daughter. From that time, A.L.D. allowed her parents to raise her son.
 

 A.L.D.’s first marriage was to B.A., a convicted sex offender. Although the home study indicated that A.L.D. was ignorant of B.A.’s history, A.L.D. testified that she knew that B.A. had been convicted of sexually molesting his daughter when she married him. However, she stated that B.A.’s former wife and friends had said that he was innocent, and so she trusted him. A.L.D. was married to B.A. for four years. N.T.F. testified that B.A. never abused her during that time. A.L.D. left B.A. and removed N.T.F. from the home when DHR advised her to do so.
 

 A.L.D. subsequently began a relationship with R.S., another sex offender. R.S.
 
 *858
 
 had been convicted of sexually molesting his daughter and another young girl. A.L.D. denied knowing that R.S. was a sex offender when he began living with N.T.F. and her. She stated that, at that time, he denied being a sex offender and that she saw him tear up his “sex offender card.” She stated that he was “a wonderful person” at the beginning of their relationship.
 

 A.L.D. lived with R.S. for two and a half years. N.T.F. testified that R.S. began sexually abusing her approximately six months after her mother began a relationship with R.S. N.T.F. was 15 years old at that time. A.L.D. testified that she discovered the abuse in July 2002 when she found R.S. naked on N.T.F.’s bed. A.L.D. and N.T.F. testified that, using a gun and a knife, R.S. threatened to kill them both if they told anyone about the abuse and that he never left them alone with a telephone or a means of transportation. A.L.D. and N.T.F. stated that they did not immediately leave R.S. because they believed his threats and because they lived in a rural area and could not easily obtain help.
 

 N.T.F. testified that she thought her mother did her best to protect her from the abuse. A.L.D. and N.T.F. testified that they remained with R.S. for 6 months after N.T.F. told A.L.D. of the abuse. However, they also testified that they did not leave R.S. until November 2003, 16 months after A.L.D. first discovered the abuse in July 2002. During that time, N.T.F. became pregnant as a result of the abuse. R.S. subsequently beat her, causing her to miscarry. A.L.D. stated that she was in counseling for her depression while she was living with R.S. but that she never told the counselor about the abuse because she was afraid.
 

 A;L.D. testified that she had attempted to contact a neighbor for help but that the neighbor had not believed her. A.L.D. and N.T.F. testified that a friend of R.S. gave them money and helped them go to a hotel from which they called the police. However, A.L.D. admitted that she was responsible for paying the bills and had access to her own money. A.L.D. and N.T.F. filed a police report, and R.S. was convicted of charges related to his abuse of N.T.F.
 

 After she left R.S. in 2003, A.L.D. was charged with child endangerment in Clay County. The charge was based on A.L.D.’s failure to protect N.T.F. from prolonged sexual abuse by R.S. A.L.D. pleaded guilty to that charge but did not serve time in jail. She stated that she had to pay a fine of approximately $3,000. A.L.D. received counseling after these events. She testified that in counseling she learned how to “watch for the red signs of bad men ... red flags.” Specifically, she stated that she learned that she should leave if she were beaten or verbally abused. AL.D.’s conviction for child endangerment was not mentioned in the home study. Nor were the details of A.L.D.’s knowledge of R.S.’s history and his abuse of N.T.F. included in the home study.
 

 A.L.D. met J.D. in July 2004. They married two weeks later. J.D.’s convictions for driving under the influence were mentioned in the home study. However, at the November 19, 2007, hearing, A.L.D. also testified that he had served time in prison for those offenses. A.L.D. stated that J.D. began drinking after they married and that she left him twice because of his drinking but later returned. A.L.D. testified that J.D. had been sober for approximately two years and that he had a good relationship with the child.
 

 DHR has allowed A.L.D. visitation with the child, and A.L.D. has attended those visits. A DHR representative testified that A.L.D. had difficulty controlling the child’s behavior during those visits.
 
 *859
 
 A.L.D. stated that she loved the child and wanted him to live with her until N.T.F. could care for him. A.L.D. stated that she did not understand why the child was taken away from her and that, in 2006, she had told a DHR representative “everything that had happened.”
 

 The psychologist who evaluated A.L.D. upon DHR’s referral testified that she suffered from bipolar disorder and depression. He also testified that she had a full-scale intelligence quotient (“IQ”) of 70; according to the psychologist, individuals with an IQ below 70 are considered mentally retarded. The evidence showed that A.L.D. was receiving counseling and medication for her depression. The psychologist stated that he had serious concerns about A.L.D.’s lack of insight and judgment. He opined that, given A.L.D.’s history, there was a “very, very high risk” of a child being at risk in her care. He further testified that, given A.L.D.’s cognitive insight, the chances that therapy would help her understand her poor decisions regarding relationships were very poor.
 

 A.L.D. argues on appeal that, based on the doctrine of judicial estoppel, the trial court erred in admitting evidence of A.L.D.’s 2003 conviction for child endangerment. She also argues on appeal that the trial court’s finding that the child was dependent was not supported by sufficient evidence.
 

 The standard of review of dependency determinations is well settled.
 

 “A finding of dependency must be supported by clear and convincing evidence. § 12 — 15—65(f)[, Ala.Code 1975];
 
 M.M.S. v. D.W.,
 
 735 So.2d 1230, 1233 (Ala.Civ.App.1999). However, matters of dependency are within the sound discretion of the trial court, and a trial court’s ruling on a dependency action in which evidence is presented ore tenus will not be reversed absent a showing that the ruling was plainly and palpably wrong.
 
 R.G. v. Calhoun County Dep’t of Human Res.,
 
 716 So.2d 219 (Ala.Civ.App.1998);
 
 G.C. v. G.D.,
 
 712 So.2d 1091 (Ala.Civ.App.1997); and
 
 J.M. v. State Dep’t of Human Res.,
 
 686 So.2d 1253 (Ala.Civ.App.1996).”
 

 J.S.M. v. P.J.,
 
 902 So.2d 89, 95 (Ala.Civ.App.2004). “ ‘ “The trial court’s decision to admit or to exclude evidence is within its sound discretion.” ’ ”
 
 B.D.S. v. Calhoun County Dep’t of Human Res.,
 
 881 So.2d 1042, 1056 (Ala.Civ.App.2003) (quoting
 
 B.S.L. v. S.E.,
 
 826 So.2d 890, 894 (Ala.Civ.App.2002), quoting in turn
 
 Roberts v. Roberts,
 
 802 So.2d 230, 236 (Ala.Civ.App.2001)). We will not reverse that decision on appeal absent a showing that the trial court exceeded that discretion.
 
 Id.
 

 A.L.D. cites only one case in her brief on appeal to support her argument, based on the doctrine of judicial estoppel, that the trial court erred in admitting evidence of her 2003 conviction for child endangerment. That case,
 
 Jinright v. Paulk,
 
 758 So.2d 553 (Ala.2000), involved tort claims of debtors in a bankruptcy proceeding, and A.L.D. cites it only for a general proposition of law. We note that the case from which
 
 Jinright
 
 drew its statement of the elements of judicial estop-pel has been overruled.
 
 See Ex parte First Alabama Bank,
 
 883 So.2d 1236, 1246 (Ala.2003), overruling
 
 Porter v. Jolly,
 
 564 So.2d 434 (Ala.1990). Accordingly, it is doubtful whether A.L.D.’s citation to
 
 Jin-right
 
 satisfies her burden under Rule 28(a)(10), Ala. R. Civ. P. However, out of an abundance of caution, we will consider A.L.D.’s argument regarding judicial es-toppel.
 

 In
 
 Selma Foundry & Supply Co. v. Peoples Bank & Trust Co.,
 
 598 So.2d 844, 846 (Ala.1992), our supreme court stated:
 

 
 *860
 
 “As the United States Court of Appeals for the Third Circuit recognized, the doctrine of judicial estoppel ‘applies to preclude a party from assuming a position in a legal proceeding inconsistent with one previously asserted. Judicial estoppel looks to the connection between the litigant and the judicial system while equitable estoppel focuses on the relationship between the parties to the prior litigation.’
 
 Oneida [Motor Freight, Inc. v. United Jersey Bank],
 
 848 F.2d [414,] 419 [(3d Cir.1988)].”
 

 In
 
 Ex parte First Alabama Bank,
 
 883 So.2d at 1246, our supreme court adopted the factors of judicial estoppel stated in
 
 New Hampshire v. Maine,
 
 532 U.S. 742, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001).
 

 “[In
 
 New Hampshire v. Maine,
 
 the United States Supreme] Court held that for judicial estoppel to apply (1) ‘a party’s later position must be “clearly inconsistent” with its earlier position’; (2) the party must have been successful in the prior proceeding so that ‘judicial acceptance of an inconsistent position in the later proceeding would create “the perception that either the first or second court was misled” ’ ...; and (3) the party seeking to assert an inconsistent position must ‘derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.’ 532 U.S. at 750-51, 121 S.Ct. 1808. No requirement of a showing of privity or reliance appears in the foregoing statement of factors to consider in determining the applicability of the doctrine of judicial estoppel.”
 

 First Alabama Bank,
 
 883 So.2d at 1244-45.
 

 A.L.D. cites no authority indicating that the doctrine of judicial estoppel applies to a juvenile case involving the custody of a child, and we have found no such authority. In light of the unique nature of juvenile cases, we question whether the doctrine of judicial estoppel should apply in juvenile matters regarding the dependency and custody of minor children. However, even if the doctrine of judicial estoppel were to apply to juvenile dependency actions such as this, the trial court did not exceed its discretion in admitting and considering evidence of A.L.D.’s 2003 conviction.
 

 “ ‘Judicial estoppel looks to the connection between the litigant and the judicial system while equitable estoppel focuses on the relationship between the parties to the prior litigation.’ ”
 
 Selma Foundry & Supply Co.,
 
 598 So.2d at 846 (quoting
 
 Oneida Motor Freight, Inc. v. United Jersey Bank,
 
 848 F.2d 414, 419 (3d Cir.1988)). In this case, it is apparent from the record on appeal that the trial court was supplied with new evidence that it did not consider in its 2006 determination based on the home study. The trial court received testimony from a psychologist regarding A.L.D.’s mental state and his opinion that a child in A.L.D.’s custody would be at “very, very high risk.” Additionally, although A.L.D. represents to this court in her brief on appeal that the “contents of [the] home study included references to [A.L.D.’s] conviction,” the home study in fact contains no mention of A.L.D.’s 2003 conviction for child endangerment. Nor does it contain much of the evidence the trial court received at the November 19, 2007, hearing, including evidence of the prolonged circumstances of N.T.F.’s abuse by R.S. or A.L.D.’s knowledge of that abuse; A.L.D.’s knowledge of R.S.’s history as a sex offender; A.L.D.’s knowledge that her first husband, B.A. was a sex offender; A.L.D.’s knowledge that her current husband, J.D., had been imprisoned for driving under the influence of alcohol; and A.L.D.’s decision to allow her parents,
 
 *861
 
 whom she states physically and verbally abused her, to raise her oldest son, A.K.
 

 For purposes of judicial estoppel, this new evidence distinguishes the relationship between A.L.D. and the trial court in the 2007 dependency proceeding from their relationship at the time of the 2006 custody determination. The new evidence precludes DHR’s position from being “clearly inconsistent” with its 2006 recommendation.
 
 See First Alabama Bank,
 
 883 So.2d at 1244^15. It also precludes any perception that the trial court was “misled” as contemplated by the second
 
 New Hampshire v. Maine
 
 factor.
 
 Id.
 

 Furthermore, the trial court and this court must consider the best interests of the child.
 
 J.W. v. C.H.,
 
 963 So.2d 114, 120 (Ala.Civ.App.2007);
 
 J.M. v. State Dep’t of Human Res.,
 
 686 So.2d 1253, 1255 (Ala.Civ.App.1996). In light of the new evidence the trial court received at the November 19, 2007, hearing, applying the doctrine of judicial estoppel as A.L.D. suggests would unduly restrict the trial court’s ability to consider the best interests of the child. Accordingly, we hold that the doctrine of judicial estoppel does not apply in this case, and the trial court did not exceed its discretion in admitting evidence of AL.D.’s 2003 conviction for child endangerment.
 

 A.L.D. next argues that the trial court erred in finding that the child was dependent. The trial court found the child dependent within the meaning of § 12 — 15— 1(10), Ala.Code 1975. In relevant part, that section defines a “dependent child” as a child:
 

 “f. Who is in a condition or surroundings or is under improper or insufficient guardianship or control as to endanger the morals, health, or general welfare of the child; or
 

 “g. Who has no proper parental care or guardianship; or
 

 [[Image here]]
 

 “k. Whose parents, guardian, or other custodian are unable to discharge their responsibilities to and for the child; or
 

 [[Image here]]
 

 “m. Who for any other cause is in need of the care and protection of the state; and
 

 “n. In any of the foregoing, is in need of care or supervision.”
 

 The trial court “must also consider the best interests of the child and may find dependency based on the totality of the circumstances.”
 
 J.M. v. State Dep’t of Human Res.,
 
 686 So.2d 1253, 1255 (Ala.Civ.App.1996).
 

 A.L.D. relies on the evidence indicating that her home was suitable for the child and presented no immediate physical dangers and that the child showed no bruises or signs of neglect. However, in light of the ore tenus evidence the trial court received, it could have found the child dependent under any of the subsections of § 12-15-l(10)(f)-(m), quoted above. The child’s putative father did not appear for the dependency hearing. The trial court received evidence that the child’s mother, N.T.F., consented to the finding of dependency. Furthermore, the trial court received evidence of J.D.’s imprisonment for driving under he influence, evidence of A.L.D.’s 2003 conviction of child endangerment, and extensive evidence regarding A.L.D.’s prolonged history of poor judgment regarding relationships and her failure to adequately protect her children. Additionally, the trial court received evidence indicating that A.L.D. suffered from bipolar disorder, that therapy likely would not help A.L.D. learn from her past mistakes regarding romantic relationships, and that the psychologist who evaluated A.L.D. had serious concerns that any child
 
 *862
 
 in A.L.D.’s custody would be at “very, very high risk” in her care. Based on this evidence, the trial court’s ruling was not plainly and palpably wrong. Accordingly, we cannot say that the trial court erred in concluding that the child is dependent within the meaning of § 12-15-1(10).
 

 AFFIRMED.
 

 PITTMAN, BRYAN, and MOORE, JJ., concur.
 

 THOMAS, J., concurs in the result, without writing.
 

 [1]
 

 . The home study indicated that paternity had been established for the child; however, as stated above, the parties represented to the trial court at the November 19, 2007, hearing that the child’s paternity had not been adjudicated.