BRYAN, Judge.
J.W. (“the father”) appeals from a judgment of the Houston Juvenile Court (“the juvenile court”) insofar as it found his two children, Ba.R.W. and Br.R.W. (“the children”), to be dependent and awarded custody of the children to T.D., the maternal uncle of the children (“the uncle”), and B.D., the uncle’s wife (“the aunt”).
*784 The father and K.W. (“the mother”) were married in 2000. The mother had a daughter, Br.D., from a previous relationship, and she gave birth to the children, who are fraternal twins, in November 2003. The mother died on October 28, 2008, and on October 29, 2008, the father presented himself to his therapist for crisis intervention. The same day, C.D., the maternal grandfather of the children (“the grandfather”) filed a petition in the juvenile court, in case nos. JU-08-68S.01 and JU-08-684.01, alleging that the children were dependent, and the juvenile court awarded pendente lite custody of the children to the grandfather.
On March 10, 2009, the uncle filed a petition in the present actions, case nos. JU-08-683.02 and JU-08-684.02, that alleged that the children were dependent, and he requested custody of the children. The uncle alleged that the grandfather could not adequately care for the children because of his age, and he further alleged that the father was verbally and mentally abusive to the children. The juvenile court conducted a hearing on March 27, 2009. At that hearing, the grandfather withdrew his petition for custody. After taking some testimony, the juvenile court recessed the hearing, and pendente lite custody of the children was awarded to the uncle and the aunt pending further orders from the juvenile court. The father was allowed only supervised visitation with the children. On May 28, 2009, the juvenile court granted a motion of the Alabama Department of Human Resources (“DHR”) that requested relief from its obligation to supervise visitation between the father and the children because, DHR alleged, the father had completed parenting classes and anger-management classes and had otherwise completed everything requested of him by DHR. On September 22, 2009, the juvenile court resumed the hearing that had begun in March 2009, and it entered a final judgment in case nos. JU-08-683.02 and JU-08-684.02 on October 2, 2009. The juvenile court found the children dependent, awarded custody of the children to the uncle and the aunt, and awarded the father unsupervised visitation with the children. Without filing a post-judgment motion, the father timely appealed. We have consolidated the father’s appeals.
The record reveals the following pertinent facts. The uncle, who was 35 years old at the time of the final hearing, testified that he and the aunt live in Columbia in a five-bedroom mobile home. The uncle testified that the aunt had three children from a previous relationship that lived with the uncle and the aunt: a boy who was 17 years old, a girl who was 15 years old, and a girl who was 12 years old. Br.D., the mother’s oldest child and the half sister of the children, also lived with the uncle and the aunt; she was 11 years old at the time of the final hearing. The uncle testified that the children, who were five years old at the time of the hearing, shared a bedroom, that Br.D. and his 15-year-old stepdaughter shared a bedroom, and that his 17-year-old stepson and 12-year-old stepdaughter each had their own bedroom. He stated that the children often spent the night at his house before the mother passed away and that all the children living in his household got along well.
The uncle testified that both of the children are enrolled in school at Head Start. However, Br.R.W. had demonstrated significant behavioral problems at school, including threatening to break his teacher’s arm. Br.R.W. had been diagnosed with attention deficit/hyperactivity disorder (“ADHD”), mild autism, pervasive developmental disorder, overanxious disorder, mood disorder, sleep disorder, and seizure episodes. The aunt testified that Br.R.W. took three types of prescription medi *785 cation, including Ritalin three times a day to treat ADHD. The aunt testified that Br.R.W.’s behavior had improved after the grandfather took custody of him following the mother’s death, and, according to the aunt, Br.R.W.’s behavior had further improved since he had moved into her home.
Both the uncle and the aunt work, and the uncle stated that the children would be eligible for insurance coverage under the aunt’s insurance plan provided through her employer. The children originally had health insurance through Medicaid, but the father had gotten the children insurance through a program called AllKids; the aunt testified that the counselor of the children did not accept AllKids insurance.
The uncle stated that he had strived to get along with the father because he had married the uncle’s sister, the mother. He stated that he had not had any contact with the father since the mother passed away. The uncle stated that the father had not supported his family, that he had not maintained a stable job, and that he would often “scream and holler” at the children. The uncle admitted that his whole family “intensely disliked” the father. However, the uncle also testified that he could set his personal feelings about the father aside in order to facilitate a relationship between the father and the children. The uncle testified that the children were thriving in his home and that the children attended Sunday School at a Baptist church in Columbia.
The aunt testified that she got along fine with the father but that she feared that he would not return the children after his visitation. The aunt testified that she had seen the father discipline the children and that, in the aunt’s opinion, the father spanked Ba.R.W. too often and that he did not spank Br.R.W. enough. She agreed that the children seem to miss the father.
The father testified that he had a history of mental illness, including anger issues since his childhood that manifested in a verbally abusive way. He agreed that he often “screamed and hollered” at the children and that the problem was so severe that he sought professional treatment in April 2008. The father was diagnosed with bipolar disorder. The father took four different prescription medications to treat his mental illness: Depakote, for mood instability; hydroxyzine, for anxiety; Effexor, for depression; and trazadone, a sedative antidepressant, for disturbed sleep.
The father testified that he had attempted suicide on September 2, 2008, because he had gone off of his medication for several days in order to have a myelogram. He was hospitalized for three days following that incident. The father admitted that Br.D. had been afraid of both him and the mother “in the last month or so,” apparently referring to the last month that the mother was alive. He stated that he knew that two knives had been found in Br.D.’s bedroom after the mother died, but the father denied that the knives had been there because Br.D. was afraid of him. The father testified that a steak knife had been in BrD.’s bedroom because he and the mother had been sleeping in that room and he had used the knife to “cut some wires.” He stated also that there had been a butter knife on the headboard, but he did not explain why it had been there.
The father admitted that he had a history of alcohol abuse and drug abuse and that it had been several years since he had used cocaine, marijuana, or methamphetamine. The father sought treatment for alcoholism in November 2008, after what Dr. David Ghostley, a licensed clinical psychologist, described as “20 years of heavy drinking.” The father admitted that he had “relapsed” in December 2008, but he *786 testified that he had not consumed alcohol since that time. The father testified that he had successfully completed anger-management classes through SpectraCare and the Wise Center and that he was still regularly seeing his psychologist in addition to his psychiatrist.
Dr. Ghostley testified that he had performed a psychological evaluation of the father on January 19, 2009, at the request of the juvenile court. Dr. Ghostley testified that, in his opinion, the father was capable of caring for the children so long as he took his prescribed medication. However, some of the statements made by the father to Dr. Ghostley were inconsistent with the father’s psychiatric records. For example, the father reported to Dr. Ghostley that he had not consumed alcohol in the two months before his suicide attempt. However, his records from Spec-traCare revealed that the father had been mixing alcohol and pain medication two weeks before his suicide attempt. After being informed of this inconsistency, Dr. Ghostley stated that he still believed that the father could care for the children if he remained on his medication. However, he also stated that, hypothetically, he could change his opinion regarding his recommendation if the father were to begin consuming alcohol again.
Pictures of the father’s home that were taken by the grandfather[1] the week before the final hearing were admitted into evidence; the pictures showed the condition of the inside of father’s home. The father stated that the room that was messiest was caused by a “busted” water heater that leaked water into a bedroom and the dining room and that that was the reason that “stuff’ was “everywhere.” The pictures showed prescription medication bottles that were left on surfaces that could be reached by the children, and there was a handwritten note taped to the father’s front door that asked the power company not to turn his power off. The father testified that he had paid his power bill by the time of the hearing.
Most concerning to the trial court, however, was one picture that showed a display of beer bottles and liquor bottles on top of the father’s refrigerator. The father testified that one bottle of liquor contained hot sauce and that the beer bottles, which were “Bud Lime Ice,” were allegedly kept by the father as collector’s items and were mementos of the kind of beer he used to drink. The father also testified that the liquor bottles that were behind the beer bottles only contained water and that he kept those bottles of liquor as mementos as well.
The father also introduced pictures of his home that he had taken the night before the final hearing; those pictures showed that his home had been cleaned. The father stated that he had let the mess in his home remain until the night before the final hearing. The father cleaned his home so that he could bring pictures of his home to court. The father admitted that parts of his home were still messy and that he did not bring any pictures of the rooms that were still messy.
The father stated that he lived in a three-bedroom trailer but that one of the bedrooms was uninhabitable because of the leak in his water heater. The father had been unemployed since March 14, 2008, as a result of a disabling injury. He said that he received a short-term and long-term disability check from his former *787 employer and that he had applied for Social Security disability benefits.
Bernice Chambers, a contract worker with DHR, testified that she had observed some of the visits between the father and the children, that the children had appeared to have a bond with the father, and that the father had not acted inappropriately with the children. The father began exercising overnight unsupervised visitation with the children approximately three weeks before the final hearing. The aunt testified that the children had been returned to her custody wearing the same clothing that they had been wearing two days earlier and that they had been dirty and had smelled like they had not been bathed. The father testified that he had not noticed any improvement in Br.R.W.’s behavior after he had moved into the uncle’s home, and the aunt testified that Br. R.W. misbehaved after visiting the father. However, the aunt also testified that Br. R.W.’s behavior had significantly improved since she had received custody of him in March 2009 and that he had even been taken off of his ADHD medication by his doctor in June 2009.
Ashley Wright, the father’s caseworker with DHR, testified that the father had completed every condition that DHR had required him to complete, including attending parenting classes, anger-management classes, and individual and group therapy. She stated that the father would be eligible for “FOCUS,” which is a service offered by DHR that would send workers to the father’s home to help the father transition to the role of a full-time caretaker of the children. Based only on the fact that the father had completed all the conditions that DHR had required him to complete, Wright testified that she was comfortable returning custody of the children to the father. However, she stated that she had not been in contact with the father since the spring of 2009 and that she was not qualified to gauge his mental stability.
The father presents three issues for review on appeal: (1) whether the juvenile court erred in determining that the children were dependant; (2) whether the juvenile court erred in awarding custody of the children to a nonparent; and (3) whether the juvenile court erred in failing to consider the dispositional options set forth in Ala.Code 1975, former § 12-15-71(a) (which was amended and renumbered, effective January 1, 2009, as § 12-15-314(a), Ala.Code 1975, a part of the Alabama Juvenile Justice Act).
“The Alabama juvenile statutes were rewritten by sweeping amendments made effective January 1, 2009, in the Alabama Juvenile Justice Act of 2008. As these proceedings were initiated by the [uncle] in March 2009, the new Act governs this case. Remaining in place in the new Act are two essential principles. First, clear and convincing evidence, as discussed in, for example, J.B. v. Cleburne County Dep’t of Human Res., 992 So.2d 34, 40 (Ala.Civ.App. 2008), still is required to support a finding of dependency. See Ala.Code 1975, §§ 12-15-310(b) and 12-15-311(a). Second, the best interests of the child remain the standard for a juvenile court’s determination that a child should be removed from its family. See Ala.Code 1975, § 12-15-101(b)(2)-(3); G.L. v. State Dep’t of Human Res., 646 So.2d 81, 84 (Ala.Civ.App.1994).”
L.H. v. Lee County Dep’t of Human Res., 40 So.3d 747, 749 (Ala.Civ.App.2009).
The father first challenges the juvenile court’s determination that the children were dependent. The father’s argument on appeal is based on his belief that the uncle was required to prove that he was unfit, pursuant to Ex parte Terry, 494 *788 So.2d 628, 632 (Ala.1986) (in which our supreme court held that a nonparent seeking custody of a child must prove that the child’s parent is unfit), before the children could be found to be dependent and before custody of the children could be awarded to the uncle and the aunt. Thus, he argues, the judgment of the juvenile court is due to be reversed because, he says, the uncle failed to offer any evidence to support a finding that the father was unfit to care for the children.
However, a finding of parental “unfitness,” as contemplated in Ex parte Terry, is not the standard that a petitioner in a dependency case is required to prove. Instead, the petitioner must present clear and convincing evidence that a child is dependent pursuant to § 12 — 15—102(8)(a), Ala.Code 1975. See L.H., supra; § 12-15 — 310(b); and § 12-15-311(a). The father cites no authority in his brief other than Ex parte Terry, supra, and former § 12-15-1(10), Ala.Code 1975 (the former code section defining dependency), for the general statement that that section provides the criteria under which a child may be deemed dependent.
This court’s deferential standard of reviewing a dependency determination is well settled. As stated above, a finding of dependency must be based on clear and convincing evidence. See L.H., supra.
‘“However, matters of dependency are within the sound discretion of the trial court, and a trial court’s ruling on a dependency action in which evidence is presented ore tenus will not be reversed absent a showing that the ruling was plainly and palpably wrong. R.G. v. Calhoun County Dep’t of Human Res., 716 So.2d 219 (Ala.Civ.App.1998); G.C. v. G.D., 712 So.2d 1091 (Ala.Civ.App. 1997); and J.M. v. State Dep’t of Human Res., 686 So.2d 1253 (Ala.Civ.App.1996).’ ”
A.L.D. v. Calhoun County Dep’t of Human Res., 2 So.3d 855, 859 (Ala.Civ.App. 2008) (quoting J.S.M. v. P.J., 902 So.2d 89, 95 (Ala.Civ.App.2004)).
A “dependent child” is defined in § 12-15-102(8)a. as a child “in need of care or supervision” that meets at least one of the circumstances listed in subsections 1. through 8. of that section. Section 12-15-102(8)a.2. states that a child may be found dependent if he or she “is -without a parent ... willing and able to provide for the care, support, or education of the child.” There was no question that the father had completed everything required of him by DHR, and we are hesitant to deny the father custody of the children under these circumstances, although this court has done so before. See R.T.B. v. Calhoun County Dep’t of Human Res., 19 So.3d 198 (Ala.Civ.App.2009) (in which this court affirmed a judgment finding the child dependent even though the mother had completed the conditions outlined in her individualized service plan, because we determined that the mother’s conduct, condition, or circumstances that had required the initial separation had not been satisfactorily eliminated).
The record is unclear about what caused the initial separation between the father and the children, because neither the grandfather’s initial dependency petition nor the order that awarded custody of the children to the grandfather is in the record on appeal.[2] However, evidence of the father’s history of mental illness and alcohol abuse and his attempted suicide in early September 2008 gives some indication of why custody of the children was awarded to the grandfather. In its final judgment, *789 the juvenile court specifically found that, although the father had
“made significant efforts toward rehabilitation, the court continues to have concerns [about the father’s] ability to parent two small children, one of whom has exhibited behavioral problems in the past. The court is particularly concerned with the condition of the home the children would live in and finds that the father’s photographic evidence of the home’s interior was prepared primarily for court and does not reflect the true living conditions into which the children would be permanently placed should the father have custody of these children. Additionally, any confidence the court may place in the father’s claim that he abstains from alcohol is shaken by the evidence of the father’s retention and display of beer bottles on his refrigerator .... ”
This court is similarly concerned about the fact that the father maintains bottles of alcohol, empty or not, in his home after 20 years of heavy drinking. Even Dr. Ghost-ley stated that he would not recommend that the father have the alcohol bottles in his home if he was trying to abstain from alcohol. Although the father claimed that certain bottles of liquor were filled with water as a memento of his former drinking days, the juvenile court could have concluded from the evidence that the father’s testimony regarding his reasons for maintaining the alcohol bottles in his home was unbelievable. Moreover, Dr. Ghostley testified that his recommendation regarding the father’s ability to care for the children could be different if the father began drinking alcohol again. Although the father maintained that he had not consumed alcohol since his relapse in December 2008, the juvenile court was in the best position to determine the credibility of the father’s testimony. See Dunn v. Dunn, 972 So.2d 810, 815 (Ala.Civ.App.2007) (“The trial court observed the parties as they testified and was in the best position to evaluate their demeanor and credibility; accordingly, we must defer to the trial court’s factual findings and its rulings based on those findings.”).
We are also concerned about evidence regarding Br.R.W. and the father’s ability to manage his behavioral problems, as the juvenile court referenced in its judgment quoted above. The aunt testified that Br.R.W. had been able to go off of his ADHD medication after only three months in her custody, but the father testified that Br.R.W.’s behavioral issues had not improved around him and the aunt noted that Br.R.W. misbehaved after visitation with the father. There was also evidence indicating that the father was neglectful to some degree regarding the hygiene of the children. The juvenile court could have considered all of that evidence, in light of its factual conclusion that the father was not abstaining from alcohol, and found that the father, at this point in his life, is unable to care for the children. Although the juvenile court did not specifically cite all of these reasons to support its determination of dependency, this court may affirm a judgment that is correct for any reason, even one not cited by the juvenile court. Boykin v. Magnolia Bay, Inc., 570 So.2d 639, 642 (Ala.1990). See also T.T.T. v. R.H., 999 So.2d 544, 557-58 (Ala.Civ.App.2008). Accordingly, we conclude that clear and convincing evidence supports a determination that the children are dependent.
The father argues that it was inconsistent for the juvenile court to adjudicate the children dependent and, at the same time, award him unsupervised weekend visitation with the children. We note that nothing in the Alabama Juvenile Justice Act prohibits a juvenile court from *790 awarding unsupervised visitation between a parent and their child after the child has been adjudicated dependent. Cf § 12-15-314(a)(1) (which allows a juvenile court to find a child dependent and return custody of the child to a parent or other legal custodian, subject to conditions or limitations that the juvenile court may prescribe). We cannot conclude that an award of unsupervised visitation following an adjudication of dependency requires this court to reverse a juvenile court’s judgment on the basis that the judgment is internally inconsistent, as the dissent argues. A finding that a parent is capable of caring for a child during a weekend visit is not equivalent to a finding that the parent is capable, on a, day-to-day basis, of providing for the care, support, and education of the child. Thus, we cannot conclude that the juvenile court’s award of unsupervised weekend visitation requires this court to reverse the juvenile court’s judgment finding the children dependent.
It is unclear from the father’s brief as to whether he has challenged the juvenile court’s judgment as to the disposition of the children. See § 12-15-311(a). However, we elect to address that issue out of an abundance of caution. As stated above, the father has only cited Ex parte Terry, supra, in support of his argument. In J.P. v. S.S., 989 So.2d 591, 600 (Ala.Civ. App.2008), a father argued that Ex parte Terry applied to the dispositional phase of a dependency action. In response, this court in J.P. stated:
“The father is correct that parents typically have the benefit of the presumption stated in Ex parte Terry in custody disputes with nonparents. However, that presumption does not apply in the dispositional phase of a dependency proceeding. W.T.H. v. M.M.M., 915 So.2d 64, 70-71 (Ala.Civ.App.2005). Once the trial court has made a finding of dependency, § 12-15-71 (a),[3] Ala. Code 1975, empowers the trial court to make various dispositions of the child, including ‘any ... order as the [juvenile] court in its discretion shall deem to be for the welfare and best interests of the child.’ § 12-15-71(a)(4). Alabama courts have interpreted that provision to mean that, in the dispositional phase of a dependency proceeding, the presumption discussed in Ex parte Terry does not apply and that a subsequent transfer of custody is determined by the ‘best interest of the child’ standard. W.T.H. v. M.M.M., 915 So.2d at 70-71; F.G.W. v. S.W., 911 So.2d 1, 3 (Ala.Civ.App.2004).”
989 So.2d at 600. Accordingly, because we have concluded that clear and convincing evidence supported the juvenile court’s determination that the children were dependent, “the ‘best interest of the child’ standard applied to the [juvenile] court’s determination that custody of the child[ren] should be transferred to the aunt and uncle.” Id.
The record reveals that sufficient evidence was presented to the juvenile court to support its award of custody to the uncle and the aunt under the best-interest standard. The evidence reflected that the children were generally well cared for and thriving in the custody of the uncle and the aunt, that the uncle and the aunt are both employed, and that they live in a home large enough to comfortably accommodate the children. The children were enrolled in school, the children attended Sunday School, and Br.R.W.’s behavioral problems had improved so much while in the uncle *791 and the aunt’s custody that he no longer needed to take his ADHD medication. Furthermore, the children were able to remain living in the same home with Br.D., their older half sister. Thus, we cannot conclude that the juvenile court’s decision to award custody of the children to the uncle and the aunt was unsupported by the evidence.
Finally, the father argues that the juvenile court did not properly consider its options concerning the disposition of the children after it determined that the children were dependent. The father’s argument is based on the following statement made by the juvenile court at the conclusion of the final hearing:
“It’s not an issue as to whether, you know, the children are in a better home or a worse home, you know, with [the father] or with the [uncle and the aunt]. It may be that the [uncle and the aunt] have a nicer home, nicer car, nicer facility. That’s not the issue. It’s just a legal issue as to whether the children are dependent under the meaning of the law. And if they’re not, then I don’t have the authority to do anything further. I can’t order FOCUS in the home. I can’t order him to go to counseling. I can’t order him to do anything because once I find no dependency, my authority over the case and the parties ends right there. I could order that. I could, you know, slap it in an order if I find the children are not dependent, but it’s all void, to tell you the truth. And he’s under no obligation if I find the children are, you know, not dependent, he’s under no obligation to abide by any further orders I issue.”
On appeal, the father argues that the juvenile court overlooked the provisions in § 12-15-71(a), during the dispositional phase of the dependency hearing. As stated above, § 12-15-71 (a) was amended and renumbered as § 12-15-S14(a), which states, in pertinent part:
“If a child is found to be dependent, the juvenile court may make any of the following orders of disposition to protect the welfare of the child:
“(1) Permit the child to remain with the parent, legal guardian, or other legal custodian of the child, subject to conditions and limitations as the juvenile court may prescribe.
“(3) Transfer legal custody to any of the following:
“c. A relative or other individual who, after study by the Department of Human Resources, is found by the juvenile court to be qualified to receive and care for the child. Unless the juvenile court finds it not in the best interests of the child, a willing, fit, and able relative shall have priority for placement or custody over a non-relative.”
The father argues that the statement made by the juvenile court reflects the juvenile court’s belief that it did not have the authority to do what is stated in § 12-15 — 314(a)(1), that is, return custody of the children to the father and set further “conditions or limitations” on that award of custody as the juvenile court found to be appropriate. However, § 12-15-314(a) refers to dispositional options after a child is found to be dependent, and the statement by the juvenile court was made in reference to the juvenile court’s limitations if the children were not found to be dependent. We agree with the juvenile court’s statement, quoted above, that the juvenile court would not have had any further authority over the father if it had found that the children were not dependent. Section 12-15-310(b) states that “[i]f the juvenile *792 court finds that the allegations in the [dependency] petition have not been proven by clear and convincing evidence, the juvenile court shall dismiss the petition.” There is no provision in the Alabama Juvenile Justice Act for the disposition of a child if the child is not proven to be dependent, and, in fact, the Act requires the juvenile court to dismiss the petition.
The statement made by the juvenile court does not, in and of itself, demonstrate that the provisions of § 12-15-314(a) were overlooked by the juvenile court. “Trial court judges are presumed to know the law.” J.F.S. v. Mobile County Dep’t of Human Res., 38 So.3d 75, 78 (Ala.Civ.App.2009) (citing Ex parte Atch-ley, 936 So.2d 513, 516 (Ala.2006)). We will not reverse the juvenile court’s judgment based on an alleged error that was not affirmatively demonstrated in the record. Tucker v. Nichols, 431 So.2d 1263, 1264-65 (Ala.1983) (discussing the “well-established rule that the appellant has an affirmative duty of showing error upon the record” and explaining that “[t]his rule is premised upon the fundamental proposition that an appellate court will not presume error and will affirm the judgment appealed from if supported on any valid legal ground”).
Because the father has failed to demonstrate error on appeal, we affirm the judgment of the juvenile court.
2090042 — AFFIRMED.
2090043 — AFFIRMED.
PITTMAN and THOMAS, JJ„ concur.
THOMPSON, P.J., concurs in the result, without writing.
MOORE, J., dissents, with writing.

. According to the father, the grandfather told the father that he had a court order to take pictures of his home. There was some indication that the grandfather took pictures in order to inventory the mother’s estate. There was no indication that the grandfather actually had a court order to take pictures of the father's home.

. The case-action-summary sheet only contains a notation that the grandfather was awarded pendente lite custody pending the final hearing.

. J.P. v. S.S., supra, was written before the enactment of the Alabama Juvenile Justice Act. Section 12-15-314 has replaced former § 12-15-71. However, the provisions of § 12-15-314(a)(4) and former § 12 — 15— 71(a)(4) are substantially the same.