MOORE, Judge.
 

 In case no. 2070626, T.B. (“the mother”) appeals from a judgment entered by the Cullman Juvenile Court on March 7, 2008, terminating her parental rights to her three children, S.C.B., A.D.B., and A.S.B.
 
 [1]
 
 That appeal has been consolidated with case no. 2070629, in which M.B.S. (“the paternal grandmother”) appeals from the same judgment, which denied her petition for custody of the children.
 

 In its judgment, the juvenile court made the following findings:
 

 “1. That the ... children are under the age of eighteen years and under the jurisdiction of this Court. [S.C.B. and A.D.B.] have been in the legal custody of [the Cullman County Department of Human Resources (hereinafter ‘DHR’) ] for nearly three years and [A.S.B.] has been in the custody of [DHR] for over nearly twenty-one months. The Court finds that [A.D.B. and A.S.B.] have a history of Asthma and will need continued administration of medication for their condition by a suitable caretaker.
 

 “2. That the children are in need of the care and protection of the State of Alabama Department of Human Resources and that it is in their best interest for the parental rights of the mother and the father to be terminated so that the children can be placed for adoption and that the Department is equipped to care for and has agreed to receive the children upon commitment by final Or
 
 *1198
 
 der of this Court and seek adoptive placement.
 

 “3. That aforesaid children have a history of neglect and/or abuse in the home of their parents. The Court finds that [the mother] is not able to meet the special needs of the children due to her mental limitations and [is] unable to provide the stability needed due to her lack of stable housing, failure to adhere fully to the provisions of the Individualized Service Plans, economic instability, and past involvement in a relationship with her husband, ... in which domestic violence is evident, but yet she has not ceased all contact with her husband.
 

 [[Image here]]
 

 “5. That clear and convincing evidence has been established that the aforesaid children are dependent and that the mother and the father of the children are unable or unwilling to discharge their responsibilities to meet the needs of the children at this time, and it is unlikely in the foreseeable future that they can provide a fit and suitable home for the children. [DHR] has made reasonable efforts toward rehabilitation of the parents, and such efforts have been unsuccessful.
 

 “6. That [DHR] has investigated all viable alternatives to termination of parental rights, and the Court finds that there exists no other viable alternative consistent with the best interest of the children other than termination of parental rights.
 

 “7. The Court finds that the children are in need of permanency.”
 

 Based on those findings, the juvenile court terminated the parental rights of the mother, denied a petition for custody filed by the mother on May 1, 2007, and denied a petition for custody filed by the paternal grandmother on August 9, 2007.
 

 Issues
 

 In case no. 2070626, the mother generally argues that the evidence is insufficient to support a termination of her parental rights. More specifically, the mother takes issue with the juvenile court’s findings that reasonable efforts to rehabilitate the mother had failed, that the mother had not adjusted her circumstances to meet the needs of the children, and that the mother’s mental problems prevent her from properly parenting the children. The mother maintains that the evidence showed that, at the time of trial, she was able to discharge her parental responsibilities to and for the children.
 

 In case no. 2070629, the paternal grandmother argues that the juvenile court erred in admitting hearsay evidence regarding her custody petition and further erred in denying her petition. As to the first point, the paternal grandmother specifically argues that the juvenile court erroneously allowed a witness for the Cullman County Department of Human Resources (“DHR”) to testify to the contents of reports and records reviewed by DHR in assessing the paternal grandmother’s fitness to take custody of the children. As to the second point, the paternal grandmother maintains that the juvenile court failed to make findings of fact regarding her custody petition and denied her petition although there was no evidence indicating that she was unsuitable to assume custody of the children and although there was no testimony that reasonable efforts were made to place the children with her.
 

 Case No. 2070626
 

 Generally speaking, when a child is removed from the parental home, DHR has a duty to use reasonable efforts to reunite the family.
 
 See
 
 Ala.Code 1975, § 12-15-65(g)(3) & (m), and
 
 J.B. v. Jefferson County Dep’t of Human Res.,
 
 869
 
 *1199
 
 So.2d 475, 481 (Ala.Civ.App.2003). Absent aggravating circumstances,
 
 see
 
 Ala.Code 1975, § 12-15-65(m), if a parent’s conditions, circumstances, or conduct interferes with the goal of reunification, DHR is required to use reasonable efforts to rehabilitate the parent and remove those barriers.
 
 C.B. v. State Dep’t of Human Res.,
 
 782 So.2d 781, 785 (Ala.Civ.App.1998) (“DHR has the duty to make reasonable efforts to rehabilitate [a parent] so that family reunification might be attainable.”). In making the sensitive decision whether to terminate parental rights, a juvenile court shall consider “[t]hat reasonable efforts by the Department of Human Resources or licensed public or private child care agencies leading toward the rehabilitation of the parents have failed.” Ala.Code 1975, § 26-18 — 7(a)(6). Furthermore, when a child is not in the physical custody of the parent, the juvenile court shall consider “[l]ack of effort by the parent to adjust his or her circumstances to meet the needs of the child in accordance with agreements reached ... with local departments of human resources ... in an administrative review or a judicial review.” Ala.Code 1975, § 26 — 18—7(b)(4).
 

 In this case, the mother does not argue that DHR failed to use reasonable efforts to rehabilitate her and to reunite her with the children.
 
 See H.H. v. Baldwin County Dep’t of Human Res.,
 
 989 So.2d 1094, 1098 (Ala.Civ.App.2008) (main opinion authored by Moore, J., with Thompson, P.J., and Bryan, J., concurring in the result). Instead, she argues that those efforts succeeded. Like the question of whether DHR’s reunification efforts were reasonable, the question whether reasonable efforts to rehabilitate a parent have succeeded so that the family can be reunited is a question of fact for the juvenile court.
 
 Id.; see also J.B.,
 
 869 So.2d at 482. In making that determination, the juvenile court must first identify the parental conduct, circumstances, or condition that led to the removal of the children and prevented them return to the custody of the parent.
 
 H.H., supra.
 
 The juvenile court must then consider the efforts expended by the parent in overcoming those problems and the progress the parent has made in eliminating or reducing those problems, so that they no longer constitute a barrier to reunification.
 
 Id.
 

 At trial, DHR bore the burden of proving that reasonable reunification efforts had failed.
 
 J.B. v. Cleburne County Dep’t of Human Res.,
 
 992 So.2d 34, 50 (Ala.Civ.App.2008) (Moore, J., dissenting) (citing
 
 In re D.B.,
 
 339 Mont. 240, 246, 168 P.3d 691, 696 (2007) (citing § 41-3-609(1)(f), Mont.Code Ann.);
 
 Division of Family Serv. v. N.X.,
 
 802 A.2d 325 (Del.Fam.Ct.2002);
 
 In re Michael G.,
 
 63 Cal.App.4th 700, 74 Cal.Rptr.2d 642 (1998); and
 
 In re Savanna M.,
 
 55 Conn.App. 807, 740 A.2d 484 (1999) (citing Conn. Gen.Stat. § 17a-112(c)(1))). By statute, DHR was required to prove that fact by “clear and convincing evidence.” Ala.Code 1975, § 26-18-7(a). “Clear and convincing evidence” is “ ‘[ejvidence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion.’”
 
 L.M. v. D.D.F.,
 
 840 So.2d 171, 179 (Ala.Civ.App.2002) (quoting Ala.Code 1975, § 6-11-20(b)(4)). On appeal “this court is
 
 ‘required
 
 to apply a presumption of correctness to the trial court’s finding[s]’ when the trial court bases its decision on conflicting ore tenus evidence.”
 
 J.C. v. State Dep’t of Human Res.,
 
 986 So.2d 1172, 1183 (Ala.Civ.App.2007) (quoting
 
 Ex parte State Dep’t of Human Res.,
 
 834 So.2d 117, 122 (Ala.2002)). We can only reverse a judgment based on a particular finding of fact in a termination-of-parental-rights case if
 
 *1200
 
 that finding is unsupported by clear and convincing evidence so as to be plainly and palpably wrong.
 
 J.B. v. Cleburne County Dep’t of Human Res.,
 
 991 So.2d 273, 282 (Ala.Civ.App.2008) (citing
 
 J.C., supra).
 

 The evidence in the record shows that in 2002, within months of the October 11, 2002, birth of S.C.B., the oldest child, DHR found the family living in a mobile home with structural, cleanliness, and other problems rendering it an improper shelter. DHR closed its case after the parents moved into the father’s sister’s house. In January 2005, following the July 6, 2004, birth of the A.D.B., the second child, DHR discovered that the family had moved back into the same mobile home, which had deteriorated into an even more unliveable condition. DHR placed the family in a hotel at that time and then moved them back into the father’s sister’s house on a temporary basis.
 

 In February 2005, the mother accused the father of sexual and physical abuse and fled with the children to a domestic-violence shelter. The mother obtained a protection-from-abuse order against the father. While in that shelter, the mother was overheard screaming and cursing at the children and was observed biting S.C.B. on the right arm. When DHR investigated, it found that A.D.B. had bruises on her forehead. DHR filed a report finding that the mother had committed child abuse; DHR removed the children from the mother’s custody on February 23, 2005.
 

 Following the removal of the children, the mother submitted to psychological testing, which revealed that she had an IQ of 85, placing her in the low average-intelligence range, and that she had an anxiety disorder. The psychologist who performed the evaluation recommended individualized psychotherapy to help the mother cope with stress-inducing events and interpersonal encounters, a parenting program to teach the mother to more positively rear the children, GED classes, and possibly job training.
 

 The mother originally attended therapy and GED and parenting classes in 2005. The mother passed a parenting class in July 2005; however, she failed to complete the GED classes. The mother testified that she did not recall DHR referring her to an entity referred to in the record as Adult Vocational Rehabilitation, but one of DHR’s witnesses testified that the mother had failed to follow up with a referral to that entity. During therapy, the mother expressed her belief that she should not be working, but should stay at home to care for the children. Accordingly, she had no motivation to obtain or implement job skills.
 

 The mother gave birth to A.S.B., her third child, on July 6, 2005. After that child’s birth, the mother resided with her grandmother and DHR monitored the child. Six months after the birth of A.S.B., the mother started in-home counseling with Dr. Jewel Euto for issues relating to her anxiety, depression, and identification of mental-health barriers to her reunification with the older children. During those sessions, Dr. Euto not only observed the mother, but also observed the conditions of the apartment in which the mother lived and her interaction with A.S.B. Dr. Euto believed the mother was mildly mentally retarded, as demonstrated by her inability to learn and retain simple information like how to keep medical appointments and how to clean and use baby bottles. Dr. Euto also found that the mother was having a hard time bonding with A.S.B. and that the mother could only parent the child with daily assistance from others, such as the mother’s grandmother. The mother did not abuse the child, but she was neglectful of the child’s needs.
 
 *1201
 
 Dr. Euto opined that the mother seemed to have no motivation to improve her parenting skills and that she could not independently raise a child.
 

 In May 2006, DHR removed A.S.B. from the custody of the mother. A DHR representative discovered that the father, who had been separated from the family since early 2005, apparently had resumed living with the family in violation of an earlier agreement DHR had reached with the mother. The DHR representative also discovered that there was no baby food in the apartment and that A.S.B. appeared malnourished. -The child had bruises on his forehead, and, in addition, cereal was laying on the floors and on the child’s bed. The mother indicated that she may have fallen asleep while feeding the child. An entity referred to in the record as Family Values had been assisting the mother in the home and had reported many problems with the mother’s lack of parenting skills.
 

 Within three months of the removal of A.S.B., the mother lost her apartment and was living with the paternal grandmother. During that time, the mother, who had been diagnosed as a schizophrenic in early 2006, began having hallucinations in which she had sex with demons and purple dogs told her to kill the DHR workers. The paternal grandmother filed a petition to involuntarily commit the mother in August 2006; that petition was denied in September 2006 based on evidence that the mother’s mental condition had stabilized after being placed on proper medication.
 

 In late 2006, the mother moved in with J.B., the father’s adoptive father (“the paternal grandfather”). The mother has lived with the paternal grandfather since that time. At the time of trial, the mother and the paternal grandfather lived in a three-bedroom apartment in a government housing project in Blountsville, their third home since they started living together. The paternal grandfather, who is 73 years old, pays all of the mother’s bills, except the mother contributes to the groceries with her food stamps. The mother does not work; she did, however, apply for Social Security disability benefits in August 2006 on account of her psychiatric condition.
 

 The mother consistently visited the children at DHR’s offices under the supervision of Family Values. Records from those visits show that the mother often failed to interact with the children, never displayed appropriate parental guidance over the children, and depended on the caseworkers and supervisors to protect and discipline the children during visitations. In late 2007, after the mother had established her most recent residence, the children were allowed to visit with the mother at her apartment. During one of those visits, one of the children was left unattended in front of the apartment. On another visit, the mother, who has a neurological condition that affects her hands, lost her grip on the youngest child and he darted across the street. Even uneventful visitations were marred by the mother’s inability to control the behavior of the children and to perform simple parenting tasks without prompting or assistance from others.
 

 Based on the foregoing, and other evidence, DHR identified numerous problems preventing the mother from reuniting with the children, including: inadequate and unstable housing, domestic violence, improper discipline and parenting techniques, mental deficiencies, lack of income, and psychiatric problems.
 

 As the mother correctly points out, she overcame some of those problems. By the time of the trial, the mother had adequate housing, which DHR had approved through a home study. The mother’s psychiatric problems were being controlled by
 
 *1202
 
 medication, as testified to by Dr. Euto. Although she was still legally married to the father, the mother was no longer in a relationship with him; the father was living with and had started a family with another woman a year before trial. Additionally, the mother had received training-on how to recognize and deal with the younger children’s asthma problems.
 

 However, the mother remained totally financially dependent on the paternal grandfather, without any plan for meeting the children’s financial needs should he leave or die. The mother had no income of her own and testified that the only income she anticipated receiving was Social Security disability benefits, which she had been waiting to receive for over 18 months. The evidence did not reveal whether those benefits would be sufficient to meet the financial needs of three young children.
 

 More importantly, despite extensive rehabilitation efforts, the mother had yet to display the ability to independently and properly care for the children. All the expert testimony and evidence in the case, and a great deal of the evidence from lay witnesses, indicated that the mother, either due to her mental limitations or lack of motivation, could not properly parent the children without full-time assistance from others. One DHR witness testified that the mother had made it through only 1 of 14 books designed to train her how to properly parent the children and that it would take the mother 3 more years to complete her training.
 

 “At some point, ... the child’s need for permanency and stability must overcome the parent’s good-faith but unsuccessful attempts to become a suitable parent.”
 
 M.W. v. Houston County Dep’t of Human Res.,
 
 773 So.2d 484, 487 (Ala.Civ.App.2000). In the absence of exceptional circumstances, a parent’s efforts at rehabilitation should not extend beyond 12 months from the date the child enters foster care because our legislature has established that period as the presumptively reasonable time for conducting reunification efforts.
 
 M.A.J. v. S.F.,
 
 994 So.2d 280, 291 (Ala.Civ.App.2008). In this case, the mother had yet to successfully demonstrate basic parenting skills well after the one-year period had been exhausted. Moreover, the record does not indicate any exceptional circumstances that would warrant extending the rehabilitation period. This is not a case in which, at the time of the trial, the mother was so close to complete rehabilitation that the interests of the children in permanency and stability would be served by granting her additional time to fulfill her parental responsibilities.
 

 The mother argues that even if she is not completely rehabilitated and requires help to parent the children, her parental rights should not be terminated because the paternal grandfather has a vested interest in the children and is available to give her the full-time assistance she needs. Putting aside his advanced age, DHR rejected the paternal grandfather as a placement resource for the children for good reasons. DHR received information, much of which was verified at trial, indicating that the paternal grandfather had abused and neglected his stepchildren and the father when he was a minor. Family Values documented the paternal grandfather’s visits with the children, during which he expressed that the children should be allowed to fight with one another to resolve their problems and during which he failed to protect and properly care for the children. Moreover, the paternal grandfather indicated in the home study that he intended the mother to be the primary caretaker for the children because he had not parented young children in many years and he felt she would know more about it. Final
 
 *1203
 
 ly, we note that the parental-rights-termination statute allows a juvenile court to terminate parental rights when the
 
 parent
 
 is unable to discharge his or her responsibilities to and for the child. Regardless of whether the paternal grandfather can assume a proper parental role, the fact remains that the mother is still unable to properly parent the children.
 

 We recognize that the evidence regarding the extent of the mother’s progress was in conflict; however, the resolution of that conflict was for the juvenile court.
 
 See J.C., supra.
 
 Clear and convincing evidence supports the juvenile court’s determination that reasonable efforts leading toward the rehabilitation of the mother had failed and that the mother was not in a position to safely reunite with the children.
 

 For the foregoing reasons, we affirm the judgment of the juvenile court terminating the mother’s parental rights.
 

 Case No. 2070629
 

 The paternal grandmother’s petition for custody was heard together with DHR’s petition to terminate the mother’s parental rights. “[A] parental-rights-termination hearing is an adjudicatory proceeding at which hearsay evidence is inadmissible.”
 
 Ex parte J.R.,
 
 896 So.2d 416, 428 (Ala.2004). On the other hand, a hearing to determine the custody of a dependent child is a disposition hearing.
 
 J.L. v. State Dep’t of Human Res.,
 
 688 So.2d 868, 870-71 (Ala.Civ.App.1997).
 

 “In disposition hearings all relevant and material evidence helpful in determining the questions presented, including oral and written reports, may be received by the court and may be relied upon to the extent of its probative value, even though not competent in a hearing on the petition. The parties or them counsel shall be afforded an opportunity to examine and controvert written reports so received and to cross-examine individuals making reports.”
 

 Ala.Code 1975, § 12-15-65(h).
 

 In cases in which dependent children have been committed to foster care, the juvenile court should decide the fitness of potential relative placements no later than at the 12-month permanency hearing and should avoid resolving petitions to terminate parental rights with petitions for custody of the children.
 
 See
 
 Ala.Code 1975, § 12-15-62(c), and
 
 A.D.B.H. v. Houston County Dep’t of Human Res.,
 
 1 So.3d 53, 68 (Ala.Civ.App.2008) (Moore, J., concurring in part and concurring in the result). In addition to other problems, by trying the adjudicatory and dispositional phases together, confusion arises as to the admissibility of evidence, with the proper resolution depending on whether the evidence pertains to the grounds for terminating parental rights or relates merely to the disposition of the child following termination. Nevertheless, Rule 25(A), Ala. R. Juv. P., specifically allows juvenile courts to simultaneously hear all phases of a case at once. In so doing, a juvenile court may accept inadmissible evidence so long as it relates solely to custodial dispositions of the child.
 

 In this case, the paternal grandmother argues that the juvenile court erred in allowing one of DHR’s witnesses to testify as to the results of its study of her fitness and qualifications to receive and care for the children.
 
 See
 
 Ala.Code 1975, § 12-15-71(a)(3)c. The record shows that testimony was offered purely on the issue whether the paternal grandmother would be a proper custodian for the children, an issue in the dispositional phase of the case. Therefore, the juvenile court did not err in allowing the testimony over the objection of the paternal grandmother. Because the paternal grandmother does not argue that she was deprived of an
 
 *1204
 
 “opportunity to examine and controvert written reports so received and to cross-examine individuals making reports,” § 12-15-65(h), we find
 
 no
 
 basis for reversing the juvenile court’s judgment.
 
 J.L.,
 
 688 So.2d at 871.
 

 In its final judgment the juvenile court did not make extensive findings regarding its reasons for denying the paternal grandmother’s petition for custody, but it did state that it had found no other viable alternative to terminating the parental rights of the mother.
 
 [2]
 
 One of the “viable alternatives” to termination of parental rights as set out in the parental-rights-termination statute is placement of the child with a fit and willing relative qualified to receive and care for the child when that placement serves the best interests of the child.
 
 See
 
 Ala.Code 1975, § 12-16-62(c) & § 12-15-71(a)(3)c. Thus, by finding no viable alternatives, the juvenile court implicitly found either that placement of the children with the paternal grandmother was not in their best interests or that the paternal grandmother was not a fit and willing relative qualified to receive and care for the children. We conclude that either finding is supported by the evidence.
 
 [3]
 

 The paternal grandmother is married and lives in Blountsville in a two-bedroom house with her husband of three years. She works 10 hours a day at a restaurant, and her husband works at night. She denied any physical or mental-health problems. She has maintained a relationship with the children, having occasionally visited with them, along with the father, while they were in DHR’s custody. She has raised five children of her own and babysits for her other grandchildren.
 

 Despite these general qualifications, DHR would not approve the paternal grandmother as a placement resource for the children when it conducted its home study of her in 2006. The paternal grandmother had been cited by DHR in the past for neglecting her own children. The reports indicated that her children showed up for school filthy and malodorous. The paternal grandmother had a criminal history that included interfering with the custody of a child, tampering with evidence, contributing to the delinquency of a child, and failing to send a child to school. Some evidence also indicated that the paternal grandmother had been guilty of kidnapping a child. Although these incidents were somewhat remote in time, they still evidence the character of the paternal grandmother and clearly and convincingly prove that she was not fit and qualified to receive and care for the children.
 

 The evidence further showed that, when she visited with the children, the paternal grandmother sometimes acted inappropriately around them and would interact with the children for only brief periods and leave before the end of the visitation peri
 
 *1205
 
 od. The record further shows that the paternal grandmother visited with the children less often as the case progressed. In addition, the paternal grandmother indicated that she would allow the father, whose parental rights have now been irrevocably terminated, to spend time with the children while in her care. When coupled with the other evidence regarding the paternal grandmother’s unfitness, the juvenile court had before it more than ample evidence to conclude that awarding custody to the paternal grandmother would not be in the best interests of the children.
 

 Finally, we reject the paternal grandmother’s last argument that DHR failed to use reasonable efforts to place the children with her. By statute, DHR has a duty to use reasonable efforts “to place the child and to complete whatever steps are necessary to finalize the permanent placement of the child.” Ala.Code 1975, § 12-15-65(m). However, DHR has no duty to make reasonable efforts to attempt to place children with an unfit relative; nor does DHR have a duty to provide services to a potential relative placement in order to improve that relative’s qualifications to receive and care for the children,
 
 see J.B. v. Cleburne County Dep’t of Human Res.,
 
 991 So.2d at 284. On the other hand, DHR does have a duty to perform a study of relatives seeking custody of dependent children.
 
 See
 
 Ala.Code 1975, § 12-15-71(a)(3)c. In this case, DHR performed that duty in a reasonable manner. As a result of that study, DHR reasonably excluded the paternal grandmother as a potential placement for the children. DHR properly discharged its burden of assessing the paternal grandmother and proving her unsuitability to obtain custody of the children.
 
 See Ex parte J.R., supra.
 

 For the foregoing reasons, we affirm the judgment of the juvenile court denying the paternal grandmother’s petition for custody.
 

 2070626 — AFFIRMED.
 

 2070629 — AFFIRMED.
 

 THOMPSON, P.J., and BRYAN, J., concur.
 

 PITTMAN, J., concurs in the result, without writing.
 

 THOMAS, J., recuses herself.
 

 [1]
 

 . The juvenile court also terminated the parental rights of the father. He did not appeal that judgment.
 

 [2]
 

 . In her brief, the paternal grandmother argues that the juvenile court erroneously terminated the mother’s parental rights despite evidence indicating that placement with her would be a viable alternative. As we recently held in
 
 B.H. v. Marion County Department of Human Resources,
 
 998 So.2d 475 (Ala.Civ.App.2008), a relative has no standing to appeal the termination of a parent's parental rights. Hence, we do not address that argument but, rather, concentrate solely on the issue for which the paternal grandmother does have standing — whether the juvenile court properly denied her custody petition.
 
 Id.
 

 [3]
 

 . The paternal grandmother argues that the clear-and-convincing-evidence standard applies to the factual questions regarding her petition for custody. DHR does not dispute that contention. Therefore, we analyze the evidence to see if it is "clear and convincing,” without making any determination as to the appropriateness of that standard.