BRYAN, Judge.
 

 L.M.W. (“the mother”) appeals from a judgment of the Etowah Juvenile Court that terminated her parental rights to S.N.B. (“the child”), a boy born in November 1999.
 

 On August 18, 2009, the Etowah County Department of Human Resources (“DHR”) filed a petition to terminate the parental rights of the mother and L.N.B. (“the father”) to the child. The juvenile court conducted an ore tenus hearing on DHR’s petition on October 14, 2009, and November 18, 2009. On December 1, 2009, the juvenile court entered an order terminating the parental rights of the mother and the father to the child. The mother timely appealed.
 
 [1]
 

 The evidence in the record revealed that DHR first became involved with the mother and the child in December 1999 when DHR investigated a child-abuse and neglect report filed against the mother alleging neglect and inadequate supervision of the child. That report was found to be “indicated” and, between December 1999 and May 2007, DHR investigated the mother on four other occasions, also on allegations of neglect and inadequate supervision, but there were no other indicated reports. In May 2007, DHR was called to investigate a claim that the child, who was seven years old at the time, had obtained gasoline and matches and had burned down a storage building behind the mother’s home. Shortly thereafter, DHR took custody of the child after the mother tested positive for methamphetamine.
 

 DHR set up an Individualized Service Plan (“ISP”) for the mother that included a psychological evaluation, outpatient substance-abuse treatment, individual counseling, random drug screens, and supervised visitation with the child. When the child was placed in foster care, Charlotte Jones, a licensed counselor, began individual counseling with the mother and the child. Jones was asked by DHR to address the mother’s parenting skills, and Jones stated that the mother had a problem accepting responsibility for the actions that contributed to the child being placed in foster care.
 

 Dr. David Wilson, a licensed psychologist, performed a psychological evaluation of the mother in June 2007 and a psychological evaluation of the child in July 2007. Dr. Wilson testified that the mother failed to grasp the seriousness of the situation regarding the child’s burning down the storage building. Dr. Wilson characterized the mother as defensive, and he stated that his main concerns about the mother were that she was not willing to admit that she had problems and that she was either unaware of the child’s behavioral problems or pretended that the child’s behavioral problems did not exist. At the time Dr. Wilson evaluated the child, the child had displayed behavioral issues such as having tantrums, hitting other children in foster care, and stealing. The child was diagnosed with attention deficit/hyperactivity disorder (“ADHD”) and adjustment disorder. In order for the child to be successful, Dr. Wilson stated, the child needed a great deal of structure, a great deal of supervision, and organization to be provided by a parental figure. In his opinion, medication alone would not solve all the child’s behavioral problems.
 

 The mother completed all the goals set forth in her ISP in November 2007, and
 
 *1206
 
 DHR placed the child in the mother’s custody in December 2007 for a trial-placement period. After the child was returned to the mother, Jones provided in-home counseling services to the mother and the child. The child’s school reported that the child had begun exhibiting behavioral problems in February 2008 because he was not taking his prescribed medication. It is undisputed that the mother was responsible for administering the child’s medication and that she had allowed the child’s Medicaid coverage to lapse. However, the mother testified that the child’s Medicaid coverage had lapsed because she was unable to timely get the child’s birth certificate from DHR, although representatives from DHR disputed that claim. Talessia English, a caseworker with DHR, admitted that the child had behavioral problems whether he took his medication or not.
 

 English conducted an ISP meeting with the mother in March 2008, after the child had been suspended from school, and English overheard the mother threatening to beat the child if he did not behave while they were at DHR’s offices. English confronted the mother and advised her to speak to the child in a different manner so he would not defy her, but the mother did not acknowledge that she had handled the situation inappropriately. English stated that the mother was not open or receptive to suggestions on how to manage the child’s behavioral problems. The child’s case was removed from English’s caseload in March 2008, and the mother regained legal custody of the child in May 2008.
 

 The mother’s in-home counseling services with Jones were increased from once a week to twice weekly after the March 2008 ISP meeting, and, after the meeting, the mother told the child that it was his fault that DHR would be coming to their home twice a week. Jones testified that she had worked with the mother on developing a behavior-modification plan for the child that kept the child on a schedule, which, according to Jones, was very important for a child diagnosed with ADHD. Jones observed that the mother had trouble functioning in her role as a parent and that the mother often exhibited argumentative behavior with the child. Jones stated that she never witnessed the mother or the child display any affection toward one another, that she did not notice a bond between the mother and the child, and that the mother blamed the child for her problems. Jones testified that the mother appeared to resent DHR’s involvement, and Jones stated that the mother had gone “through the motions” of counseling to fulfill DHR’s requirements but had not listened or applied what Jones was trying to teach her. Jones asked the mother what she thought she could do to improve her relationship with the child, and the mother told Jones that there was nothing for her to do because the child was the problem.
 

 In August 2008, DHR received a report that the child’s half sister had been hit by an automobile while in the mother’s care.
 
 [2]
 
 The half sister was not seriously injured, but the child told one of his teachers that the mother had blamed him for the half sister’s accident. The mother testified that the child did well in her home during the summer of 2008, but he started exhibiting behavioral problems again once he returned to school in August 2008. DHR received a telephone call from the child’s school on August 20, 2008, with a report that the child had been caught playing with human feces in the boys’ restroom, that he had been taunting other children, and that several people had expressed a
 
 *1207
 
 concern about a lack of supervision over the child.
 

 The mother took the child to Mountain View, a psychiatric hospital, on Thursday, August 21, 2008. DHR became aware that the child had been admitted to Mountain View on August 25, 2008, and at some point before August 27, 2008, DHR asked Mountain View to notify DHR if the mother tried to remove the child from the hospital. On August 27, 2008, the mother went to Mountain View to inquire about visiting the child and asked if he could be released. The mother apparently wanted to take the child to be treated by his private physician, but the mother was told that the child’s doctor did not recommend that the child be released. An employee at Mountain View called Betty Young, a supervisor at DHR, and the mother was informed by personnel at Mountain View that DHR had told Mountain View not to release the child to the mother.
 

 DHR received a pick-up order for the child on August 27, 2008, and the child was discharged from Mountain View on September 19, 2008, into a therapeutic.foster home. Susan Jones, a caseworker with DHR, stated that the mother expressed anger at the child’s school for failing to test him for special education and aggravation with DHR because she felt that she already knew everything about parenting a child with ADHD. DHR discontinued counseling services between the mother and Jones, and DHR referred the mother to a new counselor, Rosa Statem, for a new perspective on what could be done to address the child’s behavioral issues. The mother met with Statem for two counseling sessions, and the mother told Statem that there was nothing Statem could tell her that she did not already know. Sta-tem terminated counseling with the mother because of the mother’s mindset.
 

 Talessia English was reassigned the child’s case in October 2008, and English discussed with the mother her need for further individual counseling and English’s concerns about statements made by the mother that there was not anything that the counselors could teach her. The mother explained that Statem must have misunderstood her and that she was anxious to participate in counseling to learn how to address the child’s behavioral problems. English referred the mother to Connie Swafford, a counselor with New Foundations Family Services. Swafford testified that she counseled the mother from February 17, 2009, through March 31, 2009, and that her counseling sessions were focused on helping the mother learn to address the child’s behavioral issues in order to provide a safe and secure home environment for the child. Swafford stated that she terminated services with the mother after six counseling sessions because the mother was not making any progress and because Swafford was unable to get the mother to admit that there was a problem with the child’s behavior. Swafford stated that, if the mother ever acknowledged that the child’s behavior was inappropriate, the mother would offer an excuse to justify the behavior, such as the fact that the child did not have a father figure in his life. Swaf-ford stated that she did not believe further counseling would have been successful because the mother did not think she needed counseling and she could not take responsibility as a parent for the child’s behavior. After Swafford terminated counseling services with the mother in March 2009, DHR did not offer the mother any further services, other than visitation.
 

 DHR also offered counseling to the child when he was returned to foster care, and he received individual counseling through CED Mental Health. According to English, the child’s medication was increased and he was doing well in the therapeutic
 
 *1208
 
 foster home where he had been placed after leaving Mountain View in September 2008. The child’s foster parents were using a behavior-modification plan that kept the child on a schedule, the child was enrolled in a different school, and he made the A/B honor roll.
 

 However, in the summer of 2009, the juvenile court allegedly held a permanency hearing for the child and rejected a proposal by DHR to place the child with the father in Florida. The child was extremely distraught after hearing that he was not going to live with the father, apparently because the mother had told him that she and the half sister would move to Florida with him. The child began exhibiting behavioral problems shortly after the court hearing, and he was removed from the therapeutic foster home where he had been succeeding and was placed in a second therapeutic foster home on August 26, 2009, which resulted in another change of school. The child was suspended from that school for stabbing a classmate with a pencil. He subsequently hit his foster parent, and he was then placed in a third therapeutic foster home around September 7, 2009. Approximately 4 days later, the child ran away while he was at church with the foster parents, and English stated that, when the police found him approximately 10 minutes after he ran away, the child’s behavior was “out of control.” The child threw chairs at the police officers, shouted profanities at the police officers, and had to be handcuffed. The child was transported to Mountain View, and he remained there for 11 days. He was then transferred to the Boyd School on September 21, 2009, and he remained there at the time of the final hearing.
 

 Dr. Dennis Sizelove, a licensed psychologist, testified that he had performed a psychological evaluation of the child on September 17, 2009, while the child was in Mountain View after running away from the third therapeutic foster home. Dr. Sizelove diagnosed the child as having ADHD as well as schizoaffective disorder, which he described as a mixture of mood symptoms and psychotic symptoms, such as hallucinations or delusions. At the time Dr. Sizelove evaluated the child, the child was prescribed Seroquel, an antipsychotic drug, three times a day. Dr. Sizelove stated that the child appeared to have low self-esteem and that the child was very defensive during the evaluation. According to Dr. Sizelove, the child needed to be treated with medication and therapeutic intervention and, additionally, needed an environment that was structured and that kept stress to a minimum. Furthermore, he stated that, in light of the child’s specific diagnosis, the child would need to have positive reinforcement structure and boundaries for a significant amount of time in order for the child to be successful. Dr. Sizelove indicated that negative and demeaning statements made to the child would have a more negative affect on the child, given his condition, than on a normal child. Dr. Sizelove stated that the child had indicated that he was bonded to the mother and that he looked forward to her visits.
 

 English kept the mother apprised of the child’s circumstances throughout this time frame, and English stated that the mother seemed indifferent. When English notified the mother that the child had been returned to Mountain View, the mother responded by saying, “I’m glad you all see now that it’s not me.” English stated that the mother had not demonstrated an ability to care for the child, that the mother had not changed her situation since May 2007 regarding how she deals with the child, that the mother had not accepted responsibility as a parent to do what is necessary in order to effectively care for the child, that the mother could not recog
 
 *1209
 
 nize the significance of the child’s behavioral problems, and that, although she participated in counseling, the mother was still not willing to implement any suggestions given to her during counseling sessions. English opined that the uncertainty in the child’s situation was contributing to his behavioral problems, and she stated that she saw no evidence that the mother would be able to care for the child in the future.
 

 Ken Swafford, a family-service worker, supervised visits between the child and the mother from March 2009 through November 2009. He stated that the mother had inappropriate discussions with the child about the court case and about taking the child and the half sister to live in Florida. Ken Swafford stated that he had asked the mother not to discuss those things with the child present and that the mother had complied with his request. He also stated that he rarely saw the mother display any affection toward the child during visits, although English testified that the mother had displayed affection towards the child at the visits just before the termination hearings. English stated that the child runs to and hugs her, her supervisor, and the guardian ad litem every time he sees them. English stated that he does not have the same reaction when he sees the mother.
 

 The mother disputed any testimony that she did not demonstrate affection for the child. She stated that she had told the child that she loved him every day before dropping him off at school and that she and the child had interacted well during visits. She stated that Ken Swafford had asked her how the court hearings went and that he had never asked her not to say anything about the proceedings in front of the child. The mother stated that she did not see anything wrong with the way she spoke to or addressed the child. In response to the question whether there was anything that the mother could do differently to help the child, she stated that the child’s behavior could be “great” with the proper level of medication but that, even with the proper level of medication, she would have to closely supervise the child.
 

 English stated that the permanency plan for the child was adoption but that DHR could keep custody of the child, allow the child to remain in a foster-care facility, and allow the mother to continue visiting the child. However, English did not believe that that arrangement would be in the child’s best interest. English stated that DHR had tried every possible alternative to reunification, that DHR had looked for other paths to reunification, that none had been successful, and that she could not recommend that the mother receive custody of the child. English admitted that the mother’s home was not an issue, that the mother’s employment was not an issue, and that the child’s safety in the mother’s home was not an issue. English explained that when she said that the mother had failed to change her circumstances, she meant that the situation that the mother had failed to change was “her attitude and her way in which she deals with [the] child.” English also testified that DHR’s problem with the mother was that she was not dealing with the child’s behavioral problems in the way that the counselors and DHR thought that she should.
 

 It was undisputed that the mother loved the child, that the child loved the mother, that the child wanted to return to the mother’s home, and that the mother had consistently exercised her visitation rights with the child. The mother had not tested positive for an illegal drug since the initial positive drug screen in May 2007. According to the mother, she had done research on ADHD and had implemented some suggestions made by Charlotte Jones about
 
 *1210
 
 creating a schedule for the child, praising the child, and encouraging him. She testified that neither Rosa Statem nor Connie Swafford had given her any instruction on how to handle a child with ADHD. English asked the mother in October 2008 about possible relative resources that might be available for the child, but the mother did not give DHR any names of possible resources.
 

 In determining whether to terminate parental rights, a juvenile court is required to apply a two-prong test: “(1) clear and convincing evidence must support a finding that the child is dependent; and (2) the court must properly consider and reject all viable alternatives to a termination of parental rights.”
 
 B.M. v. State,
 
 895 So.2d 319, 331 (Ala.Civ.App.2004) (citing
 
 Ex parte Beasley,
 
 564 So.2d 950, 954 (Ala.1990)). The juvenile court, for a finding of dependency, must consider whether there are grounds for terminating a parent’s parental rights.
 
 K.A.P. v. P.P.,
 
 11 So.3d 812, 817 (Ala.Civ.App.2008).
 

 The statutory grounds for terminating parental rights are set forth in § 12-15-319, Ala. Code 1975. That section provides, in pertinent part:
 

 “(a) If the juvenile court finds from clear and convincing evidence, competent, material, and relevant in nature, that the parents of a child are unable or unwilling to discharge their responsibilities to and for the child, or that the conduct or condition of the parents renders them unable to properly care for the child and that the conduct or condition is unlikely to change in the foreseeable future, it may terminate the parental rights of the parents. In determining whether or not the parents are unable or unwilling to discharge their responsibilities to and for the child and to terminate the parental rights, the juvenile court shall consider the following factors including, but not limited to, the following....”
 

 A juvenile court is then permitted to consider circumstances listed in 12 numbered subsections. Subsection (7) requires the juvenile court to consider that reasonable efforts made by DHR “leading toward the rehabilitation of the parents have failed,” and subsection (12) requires the juvenile court to consider the parent’s lack of effort to “adjust his or her circumstances to meet the needs of the child in accordance with agreements reached” with DHR.
 

 On appeal the mother presents two issues for review by this court: (1) she argues that DHR failed to present clear and convincing evidence that she was unable or unwilling to discharge her responsibilities to and for the child or that her condition or conduct was such as to render her unable, presently and in the foreseeable future, to properly care for the child, and (2) she argues that the juvenile court failed to consider viable alternatives to terminating her parental rights.
 

 “This court’s standard of appellate review of judgments terminating parental rights is well settled. A juvenile court’s factual findings, based on ore tenus evidence, in a judgment terminating parental rights are presumed to be correct and will not be disturbed unless they are plainly and palpably wrong.
 
 See, e.g., F.I. v. State Dep’t of Human Res.,
 
 975 So.2d 969, 972 (Ala.Civ.App.2007). Under express direction from our supreme court, in termination-of-parental-rights cases this court is
 
 ‘required,
 
 to apply a presumption of correctness to the trial court’s finding[s]’ when the trial court bases its decision on conflicting ore ten-us evidence.
 
 Ex parte State Dep’t of Human Res.,
 
 834 So.2d 117, 122 (Ala.2002) (emphasis added). Additionally, we will reverse a juvenile court’s judgment terminating parental rights only if
 
 *1211
 
 the record shows that the judgment is not supported by clear and convincing evidence.
 
 F.I.,
 
 975 So.2d at 972.”
 

 J.C. v. State Dep’t of Human Res.,
 
 986 So.2d 1172, 1183 (Ala.Civ.App.2007) (footnote omitted).
 

 First, the mother argues that DHR failed to present clear and convincing evidence to show that the child was dependent within the meaning of § 12-15-319. The mother argues that she completed everything that DHR required of her pursuant to her ISP and that the only relevant question is whether clear and convincing evidence demonstrated that her efforts to comply with counseling had failed.
 

 “[T]he question whether reasonable efforts to rehabilitate a parent have succeeded so that the family can be reunited is a question of fact for the juvenile court.
 
 [H.H. v. Baldwin County Dep’t of Human Res.,
 
 989 So.2d 1094, 1098 (Ala.Civ.App.2008) (main opinion authored by Moore, J., with Thompson, P.J., and Bryan, J., concurring in the result) ];
 
 see also J.B.[ v. Jefferson County Dep’t of Human
 
 Res.], 869 So.2d [475,] 482 [ (Ala.Civ.App.2003) ]. In making that determination, the juvenile court must first identify the parental conduct, circumstances, or condition that led to the removal of the children and prevented their return to the custody of the parent. '
 
 H.H., supra.
 
 The juvenile court must then consider the efforts expended by the parent in overcoming those problems and the progress the parent has made in eliminating or reducing those problems, so that they no longer constitute a barrier to reunification.
 
 Id.”
 

 T.B. v. Cullman County Dep’t of Human Res.,
 
 6 So.3d 1195, 1199 (Ala.Civ.App.2008). DHR bore the burden of proving, by clear and convincing evidence, that reasonable efforts at reunification had failed.
 
 Id.
 
 “Clear and convincing evidence” is “ ‘[e]vidence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion.’ ”
 
 L.M. v. D.D.F.,
 
 840 So.2d 171, 179 (Ala.Civ.App.2002) (quoting § 6-11-20(b)(4), Ala.Code 1975).
 

 DHR received custody of the child for the second time in August 2008, after the mother sought to remove the child from a psychiatric hospital against the advice of his doctor. DHR referred the mother to a different counselor, Rosa Statem, who could possibly provide new insight on how the mother could control the child and resolve his behavioral problems. However, Statem discontinued counseling services with the mother because the mother indicated to Statem that there was nothing Statem could tell her that she did not already know about how to parent the child. After English discussed the mother’s attitude toward counseling with the mother, English referred the mother to Connie Swafford, the third counselor to work with the mother since May 2007. Swafford conducted six counseling sessions with the mother before she terminated services with the mother because of the mother’s refusal to recognize the problems with the child’s behavior and her inability to take responsibility in resolving the child’s behavioral problems.
 

 The evidence indicated that, throughout DHR’s involvement with the mother, the mother consistently blamed everyone, including DHR, the child’s school, and even the child himself, for her inability to regain custody of the child, and she could not recognize the fact that her conduct was the reason that the child was prevented from returning to her custody. Despite the fact that DHR offered the
 
 *1212
 
 mother the services of three different counselors to help her develop the parenting skills needed to appropriately parent the child, DHR was unable to return the child to the mother’s custody because the mother was unable to recognize that she did not foster the type of therapeutic environment that the child needed to overcome his behavioral issues. That evidence was sufficient to place a firm conviction in the mind of the trier of fact that DHR made reasonable efforts to rehabilitate the mother so that she could be reunited with the child and that those efforts had failed. § 12-15-319(a)(7). Even if the mother’s efforts at rehabilitating herself through counseling could be described as good-faith efforts to try and adequately meet the needs of the child, this court has held that “ ‘[a]t some point, ... the child’s need for permanency and stability must overcome the parent’s good-faith but unsuccessful attempts to become a suitable parent.’”
 
 T.B.,
 
 6 So.3d at 1202 (quoting
 
 M.W. v. Houston County Dep’t of Human Res.,
 
 773 So.2d 484, 487 (Ala.Civ.App.2000)).
 

 Although the evidence indicated that the child’s behavioral problems persisted after he was removed from the mother’s care, the evidence also indicated that the child was doing well in the first therapeutic foster home that he was placed in until the juvenile court did not approve the father as an appropriate placement for the child. The child’s behavioral problems then became so severe that he was removed from his foster home, where he had been doing well, and placed in two different therapeutic foster homes before being placed in the Boyd School, where he remained at the time of the final hearing. Because there was evidence indicating that the mother had told the child that she and the half sister would move to Florida with the child once the child was placed in the father’s custody, the juvenile court could have concluded that the mother’s influence on the child fostered an environment that was not conducive to the type of therapeutic environment that the child needed to manage his behavioral problems, i.e., an environment free from preventable stress.
 
 See C.W. v. State Dep’t of Human Res.,
 
 826 So.2d 171, 173 (Ala.Civ.App.2002) (affirming termination of a mother’s parental rights when her children demonstrated serious behavioral issues and mother was unable to provide “therapeutic care tailored to their individual emotional problems”). Accordingly, we conclude that clear and convincing evidence supported the juvenile court’s determination that the mother was unable or unwilling to discharge her responsibilities to and for the child. § 12-15-319(a).
 

 Finally, the mother argues that the juvenile court failed to consider viable alternatives to termination of her parental rights.
 

 “The determination of whether a viable alternative to termination of parental rights exists is a question of fact to be decided by the juvenile court.
 
 See Ex parte J.R.,
 
 896 So.2d 416 (Ala.2004). On appeal from ore tenus proceedings in a termination-of-parental-rights case, this court presumes that the juvenile court’s factual findings regarding viable alternatives are correct.
 
 See J.C. v. State Dep’t of Human Res.,
 
 986 So.2d 1172, 1183 (Ala.Civ.App.2007).”
 

 J.B. v. Cleburne County Dep’t of Human Res.,
 
 991 So.2d 273, 282 (Ala.Civ.App.2008).
 

 The mother argues that her parental rights should not have been terminated in light of the fact that the child was diagnosed with schizoaffective disorder in the month preceding the start of the final hearing. The mother argues that, if she had been aware of the child’s diagnosis, the child could have been given different medication and she could have been given
 
 *1213
 
 a more appropriate behavior-modification plan for the child. However, Charlotte Jones testified that the behavior-modification plan that she had recommended to the mother for the child would not have changed even if she had known that the child had been diagnosed with schizoaffec-tive disorder because her recommended behavioral plan was based on the behavior of the mother and the child that she had witnessed during counseling. Furthermore, the evidence indicated that the mother placed all the blame for her situation on the child and his special needs, and the juvenile court could have concluded that, even with a different diagnosis, the mother would have continued to see the child as the only problem and that any further counseling services offered to the mother would have been futile.
 

 In her argument, the mother cites
 
 J.B. v. DeKalb County Department of Human Resources,
 
 12 So.3d 100, 116 (Ala.Civ.App.2008) (plurality opinion), wherein this court, discussing
 
 M.A.J. v. S.F.,
 
 994 So.2d 280 (Ala.Civ.App.2008), stated that
 

 “the Alabama Juvenile Justice Act (‘the AJJA’), Ala.Code 1975, § 12-15-1 et seq., does not forbid lengthy stays in foster care, even placements exceeding a year; it only requires juvenile courts to use reasonable efforts to end foster-care placement in favor of a permanent placement when a parent is not making reasonable efforts to rehabilitate himself or herself or when reasonable efforts at family reunification are not required, have failed, or would be futile.”
 
 [3]
 

 The mother argues that there was evidence to show that she was making continued efforts to be reunited with the child. This suggests that the mother believes that the child should remain in foster care while she continues to rehabilitate herself so that she can be reunited with the child. Based on the evidence in the record, the juvenile court could have determined that it would not be in the best interest of the child to delay permanency in order to allow the mother to utilize the services of a fourth counselor.
 
 See J.C. v. State Dep’t of Human Res.,
 
 986 So.2d at 1191-94 (holding that the paramount consideration in termination-of-parental-rights proceeding is the best interests of the child). The evidence in the record indicated that the mother had the ability to complete goals set by DHR but that she had failed to demonstrate any real change in her conduct or circumstances that demonstrated that she had accepted the fact that the environment that she fostered in her home was contributing to the child’s inability to overcome his behavioral issues. Because the mother could not accept responsibility for any part of the child’s behavioral problems, the juvenile court could have concluded that to allow the mother additional time to receive further counseling would have been futile and would have only further delayed the establishment of permanency and stability in the child’s life. Furthermore, we have concluded that DHR made reasonable efforts to rehabilitate the mother and that those efforts had failed.
 
 *1214
 
 Thus, the juvenile court could have concluded that allowing the child to remain in foster care beyond the presumptively reasonable time of 12 months,
 
 see M.A.J., supra,
 
 was not appropriate in this case because there was no indication that further rehabilitative efforts would have successfully reunited the mother and the child. Thus, we conclude that the evidence supports the juvenile court’s determination that there were no viable alternatives to terminating the mother’s parental rights to the child.
 

 Accordingly, because DHR proved, by clear and convincing evidence, grounds for terminating the mother’s parental rights and that no viable alternatives to termination existed, we affirm the judgment of the juvenile court.
 

 AFFIRMED.
 

 PITTMAN and THOMAS, JJ., concur.
 

 THOMPSON, P.J., and MOORE, J„ dissent, without writings.
 

 [1]
 

 . The father has not appealed the judgment terminating his parental rights to the child.
 

 [2]
 

 . Apparently, the mother had legal custody of the child’s half sister, but the half sister had lived with her paternal grandparents since she was an infant.
 

 [3]
 

 .
 
 J.B. v. DeKalb County Department of Human Resources
 
 refers to the Alabama Juvenile Justice Act, § 12-15-1 et seq., Ala.Code 1975. However, the Alabama Legislature enacted a new Alabama Juvenile Justice Act ("the new AJJA”), § 12-15-101 et seq., Ala.Code 1975, that became effective January 1, 2009, and the new AJJA repealed or amended and renumbered the provisions in the former Alabama Juvenile Justice Act. Former § 12-15-62(c), Ala.Code 1975, which was discussed in
 
 M.A.J. v. S.F.
 
 required juvenile courts to hold a permanency hearing to determine a child’s disposition within 12 months of the date that a child first entered foster care. Section 12-15 — 62(c) was amended and renumbered in § 12-15-315, Ala.Code 1975, which is a part of the new AJJA, and the two provisions are substantially similar.